STATE OF CONNECTICUT *v.* MARTIN W. SHIFFLETT
(11346)

HEALEY, SHEA, DANNEHY, SANTANIELLO and DEAN, Js.

Argued February 6—decision released May 20, 1986

*Kathleen Eldergill,* for the appellant (defendant).

*Susan C. Marks,* deputy assistant state's attorney, with whom, on the brief, were *John J. Kelly,* chief state's attorney, and *Carl Schuman,* assistant state's attorney, for the appellee (state).

DANNEHY, J. The defendant, Martin W. Shifflett, was indicted for murder in violation of General Statutes § 53a-54a. The defendant was tried by a jury, found guilty and sentenced to life imprisonment with a minimum term of twenty-five years. His appeal raises a number of issues which center on the admission into evidence of the defendant's confession given during custodial interrogation by Connecticut state police officers. Relevant facts will be discussed as needed for an examination of the issues presented by the defendant.

I

FACTS

Testimony at trial revealed that on February 14, 1980, Cara Quinn, age sixteen, was reported missing. She was found dead in a wooded area of Shelton on March 2, 1980. Her death resulted from gunshot wounds to the neck and head. An autopsy of the victim showed that she had been raped before she was murdered.

Connecticut state police ballistics specialists soon determined that the fatal shots had been fired from a Basque .380 caliber semi-automatic pistol, manufac-

tured by the Echasa Company of Spain. The defend-
ant became a suspect in the slaying when police learned
that he had acquired such a gun between twelve and
eighteen months earlier. The defendant was on parole
at the time of the murder, and had been identified as
the perpetrator of two recent sexual assaults, one in
Fairfield on February 22, 1980, and the other in Green-
wich on March 20, 1980. The attendance records main-
tained by the defendant's employer showed that the
defendant had not reported for work on February 14,
1980, the day the victim disappeared. Police also
learned that the defendant's in-laws lived in the vicin-
ity of the wooded area where the victim's body had been
found.

On the basis of these facts, the police obtained a war-
rant to search the defendant's apartment in Bridge-
port, which was executed on March 21, 1980. Although
the search failed to produce the murder weapon, the
police seized a weapon container—a red and black plas-
tic box with the name "Basque" inscribed on its top—
and various paraphernalia for such a gun. The police
also seized a photograph of the defendant standing
beside a rather extensive gun collection. One of the
guns in the photograph was a Basque .380 caliber pistol.

Sometime thereafter, the defendant left the state, in
violation of the conditions of his parole. A parole viola-
tion warrant was issued for his arrest. On July 11, 1980,
the defendant was arrested in Alabama on unrelated
charges. When a routine computer check indicated that
the defendant was wanted in Connecticut, New York
and Ohio, the Alabama authorities immediately noti-
fied the Connecticut state police. The next day, July 12,
1980, troopers James Cavanaugh and Paul Reid of the
Connecticut state police major crimes task force arrived
in Alabama to interview the defendant at the place
where he was confined. A series of interviews, extend-
ing over the next four days, culminated in the defend-

ant's confession to the February 14, 1980 murder and sexual assault. At his trial, the defendant objected to the admission into evidence of his confession, claiming that it had been obtained in violation of his rights under the fourth, fifth and fourteenth amendments to the federal constitution, and article first, § 8, of the Connecticut constitution. We now turn to the claims.

## II

### ALABAMA INTERROGATION

The defendant was arrested on the Alabama state charges on July 11, 1980. Later that same day he was arraigned in the United States District Court for the District of Alabama on the federal charge of unlawful flight to avoid confinement in Connecticut. The United States Magistrate advised the defendant of his rights under *Miranda* v. *Arizona,* 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), and appointed counsel to represent him on the federal charge. The defendant on this appeal does not challenge the legality of his arrest or confinement in Alabama.

Cavanaugh and Reid commenced custodial interrogation of the defendant at 2:30 p.m. on July 12, 1980. The interview lasted for two hours and ten minutes, ending at 4:40 p.m. Before any questioning the troopers read the defendant his *Miranda* rights from a standard form. The defendant marked each statement of rights printed on the form with his initials to indicate that he had been so advised. He expressly refused, however, to sign the bottom portion of the form which would have acknowledged his consent to waive those rights. The defendant explained his refusal to sign the waiver portion of the form by stating that although he was willing to speak with the troopers, he did not desire to give a written statement. The troopers then advised the defendant that they were investigating the February 14, 1980 homicide, and related the details of their

ongoing investigation. They informed the defendant that he had become a suspect because he was known to possess a Basque .380 semi-automatic pistol of the type used to murder the victim. The defendant was already aware that he was wanted for questioning in connection with the homicide investigation because he had been so informed by his family, with whom he had maintained contact while a fugitive. The defendant in fact complained to Cavanaugh and Reid that certain members of his family had been harrassed by police in their attempts to ascertain the defendant's whereabouts.

The interrogation of the defendant was not transcribed or recorded. We must, therefore, reconstruct what occurred from the testimony adduced at the pretrial hearing conducted on the defendant's motion to suppress his oral statements. While we are assisted in this case by the trial court's detailed memorandum of decision, " 'our usual deference to fact-finding by the trial court is qualified, on questions of this nature, by the necessity for a scrupulous examination of the record to ascertain whether such a factual finding is supported by substantial evidence. . . .' " *State* v. *Pellegrino,* 194 Conn. 279, 288–89, 480 A.2d 537 (1984), quoting *State* v. *Harris,* 188 Conn. 574, 579–80, 452 A.2d 634 (1982), cert. denied, 460 U.S. 1089, 103 S. Ct. 1785, 76 L. Ed. 2d 354 (1983).

Although the precise sequence of events cannot be determined from the record, it is fairly clear that the dominant theme of the interrogation involved the troopers' attempts to persuade the defendant to divulge the location of the gun. It is also clear that at the very beginning of the July 12, 1980 interview session the defendant informed the troopers that he did not want to talk about the gun. Thereafter, during the remainder of the interview, the troopers were cautious to approach the subject of the gun only indirectly. They produced

a National Crime Information Center (NCIC) "rap sheet" listing the various charges pending against the defendant in several states, and initiated a discussion of these charges. At some point during this discussion, the defendant stated that he would like to resolve all of these charges in one "package deal," to be worked out between his attorney and the state's attorney upon his return to Connecticut. The troopers replied that no one wanted him to plead guilty to a murder that he did not commit, and stressed, apparently several times, that ballistics testing on the gun might positively clear him of all suspicion of the February 14, 1980 homicide. The defendant again demurred, explaining that he did not want to "cop out" to any of the charges against him until a "package deal" could be arranged. Cavanaugh asked the defendant if the package would include the February 14, 1980 homicide, and the defendant responded that it would. Soon thereafter, as they were about to leave, the troopers one last time reemphasized that recovery of the gun and ballistics testing might lead to the defendant's complete exculpation. In response, the defendant's face settled into a grin. He said nothing.

Cavanaugh and Reid returned to the defendant's cell the next day, July 13, 1980, and interviewed him for approximately one hour, between 4 and 5 p.m. The defendant was again read the standard *Miranda* warnings, and he initialed each of his rights on a standard advisement form. He again expressly refused to sign the waiver portion. The troopers began by showing the defendant the photograph of the gun collection which had been seized during the search of his apartment. The defendant was then asked to identify the Basque .380 caliber pistol, which he did. After further questioning, the defendant confessed to the February 14, 1980 murder and sexual assault, relating specific details of the incident that only the perpetrator could have known.

He also admitted his guilt in the recent Greenwich and Fairfield sexual assaults. The defendant explained that the reason for the "package deal" was that he would have difficulty admitting to his wife and mother that he had murdered the young victim of the February 14, 1980 incident, whom he described as "a nice girl." He stated that his intention was to tell his wife and mother that he had been forced to plead guilty to the murder in order to dispose at once of all of the various charges pending against him. The defendant again refused to give a written statement, stating that he "wanted to hold something back."

The defendant was interviewed again the following day, July 14, 1980, from 11:50 a.m. until 2 p.m. He provided additional details of the crime, describing in particular how he had melted the Basque .380 pistol with a blowtorch at his former place of employment in Bridgeport. Upon arrival in Connecticut on July 15, 1980, the defendant showed the troopers the exact location where the gun had been melted down. A search of the area produced metal parts that were later identified as having come from a Basque pistol.

The defendant on this appeal challenges the admissibility of his confession under the fourth, fifth and fourteenth amendments to the United States constitution and article first, § 8, of the Connecticut constitution.[1] We summarize these claims briefly before addressing their merits. Under the fourth amendment the defend-

---

[1] The defendant also suggests that his sixth amendment right to counsel was violated. *United States* v. *Gouveia,* 467 U.S. 180, 193, 104 S. Ct. 2292, 81 L. Ed. 2d 146 (1984) (Stevens, J., concurring). He does not contend that this right attached upon his presentment in federal district court on July 11, 1980, on the federal charge of unlawful flight to avoid confinement in Connecticut. See *State* v. *Derrico,* 181 Conn. 151, 167–68, 434 A.2d 356, cert. denied, 449 U.S. 1064, 101 S. Ct. 789, 66 L. Ed. 2d 607 (1980). Rather, he claims a sixth amendment right to counsel because the murder investigation had ceased to be "a general inquiry into an unsolved crime" at the time of his interrogation. *Escobedo* v. *Illinois,* 378 U.S. 478, 490, 84 S. Ct.

ant contends that his confession was the fruit of an illegal search because he confessed, on July 13, 1980, only after he had been shown the photograph of the gun collection which had been seized during the search of his apartment. This search, he contends, was not supported by probable cause, and therefore, the confession must be suppressed under *Wong Sun* v. *United States,* 371 U.S. 471, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963). Under the due process clause of the fourteenth amendment the defendant claims that his confession was involuntary. *Mincey* v. *Arizona,* 437 U.S. 385, 98 S. Ct. 2408, 57 L. Ed. 2d 290 (1978); *Jackson* v. *Denno,* 378 U.S. 368, 84 S. Ct. 1774, 12 L. Ed. 2d 908 (1964). Under the fifth and fourteenth amendments the defendant claims: (1) that his confession was obtained without a prior waiver of his *Miranda* rights; *North Carolina* v. *Butler,* 441 U.S. 369, 99 S. Ct. 1755, 60 L. Ed. 2d 286 (1979); (2) that Cavanaugh and Reid continued to question him after he had invoked his right to remain silent about the gun; *Michigan* v. *Mosely,* 423 U.S. 96, 96 S. Ct. 321, 46 L. Ed. 2d 313 (1975); and (3) that Cavanaugh and Reid continued to question him after he had "constructively" invoked his right to counsel. *Edwards* v. *Arizona,* 451 U.S. 477, 101 S. Ct. 1880, 68 L. Ed. 2d 378, reh. denied, 452 U.S. 973, 101 S. Ct. 3128, 69 L. Ed. 2d 984 (1981); *State* v. *Barrett,* 197 Conn. 50, 495 A.2d 1044 (1985). It is undisputed that the defendant was legally in custody when he gave his confession, and that the confession was the product of police interro-

1758, 12 L. Ed. 2d 977 (1964). The United States Supreme Court has held that the sixth amendment right to counsel does not attach until the "initiation of adversary judicial proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Kirby* v. *Illinois,* 406 U.S. 682, 689, 92 S. Ct. 1877, 32 L. Ed. 2d 411 (1972); see *State* v. *Ferrell,* 191 Conn. 37, 44 n.10, 463 A.2d 573 (1983); *State* v. *Ledbetter,* 185 Conn. 607, 609, 441 A.2d 595 (1981). In the present case the defendant was not arrested on the murder charge until several days after his return to Connecticut. We therefore reject the defendant's sixth amendment claim on the grounds advanced in this appeal.

gation. *Rhode Island* v. *Innis,* 446 U.S. 291, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980).

## III

### VOLUNTARINESS

We turn first to the defendant's claim that his confession was involuntary. Irrespective of *Miranda,* and the fifth amendment itself; see *Oregon* v. *Elstad,* 470 U.S. 298, 306–307, 105 S. Ct. 1285, 84 L. Ed. 2d 222 (1985); *New York* v. *Quarles,* 467 U.S. 649, 654, 104 S. Ct. 2626, 81 L. Ed. 2d 550 (1984); *Michigan* v. *Tucker,* 417 U.S. 433, 444, 94 S. Ct. 2357, 41 L. Ed. 2d 182 (1974); any use in a criminal trial of an involuntary confession is a denial of due process of law. *Mincey* v. *Arizona,* supra, 398; *Jackson* v. *Denno,* supra, 376. The voluntariness of a confession must be determined by the trial court as a preliminary question of fact; *Sims* v. *Georgia,* 385 U.S. 538, 87 S. Ct. 639, 17 L. Ed. 2d 593 (1967); and we scrutinize the trial court's finding closely to ensure that it comports with "constitutional standards of due process." *State* v. *Derrico,* 181 Conn. 151, 163, 434 A.2d 356, cert. denied, 449 U.S. 1064, 101 S. Ct. 789, 66 L. Ed. 2d 607 (1980); *State* v. *Toste,* 198 Conn. 573, 584, 504 A.2d 1036 (1986). "We have stated that ' " 'the test of voluntariness is whether an examination of all the circumstances discloses that the conduct of "law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined . . . . " *Rogers* v. *Richmond,* 365 U.S. 534, 544 [81 S. Ct. 735, 5 L. Ed. 2d 760] (1961).' " ' *State* v. *Staples,* [175 Conn. 398, 408, 399 A.2d 1269 (1978)]; see *State* v. *Derrico,* supra, 163. 'The ultimate test remains . . . . "Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination

critically impaired, the use of his confession offends due process." ' *Schneckloth* v. *Bustamonte,* 412 U.S. 218, 225, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973) . . . ." *State* v. *Stankowski,* 184 Conn. 121, 132, 439 A.2d 918, cert. denied, 454 U.S. 1052, 102 S. Ct. 596, 70 L. Ed. 2d 588 (1981).

The defendant made incriminating statements during custodial interrogation on four successive days, beginning with the initial session on July 12, 1980. After having resisted the entreaties of Cavanaugh and Reid during the initial session to divulge the location of the murder weapon, the defendant, by the end of the second session on July 13, 1980, had fully confessed to the February 14, 1980 murder and sexual assault under investigation, as well as to unrelated sexual assaults committed in Greenwich, Fairfield and in Finley, Ohio. Thereafter, during the third and fourth sessions on July 14 and 15, 1980, the defendant compliantly revealed the additional details necessary to complete the story of his guilt. We must therefore review the course of events during this four day period to determine whether the conduct of Cavanaugh and Reid was such as to overbear the defendant's capacity for rational choice in light of his age, intelligence, background and experience. *State* v. *Toste,* supra, 584.

The defendant was thirty-two years old at the time he confessed to these crimes. He was married, and had been gainfully employed since his release from prison in 1979. He had been convicted of at least five previous felonies, and readily conceded at trial, and concedes on appeal, that he fully understood his *Miranda* rights. Although the defendant had achieved only a tenth grade education, he could read and write, and an examination of his testimony at trial clearly indicates that he possessed above-average intelligence. He testified that he had been present at his apartment on March 21, 1980, when police arrived to execute the search war-

rant. He had departed without being noticed, and learned shortly thereafter that police had questioned his family and friends about the Basque .380 handgun and the February 14, 1980 murder. Approximately three days after the search of his apartment, the defendant left the state of Connecticut, embarking upon a series of cross-country trips to avoid apprehension. During these trips he exchanged automobiles on three separate occasions, and maintained contact with his cousin, Edward Reskus, who wired him money at pre-arranged times and locations. The defendant testified that it was "pretty obvious" why Cavanaugh and Reid had produced the NCIC "rap sheet" and had referred to the various charges pending against him. According to the defendant, it was not he, but Cavanaugh, who suggested that he plead guilty to the February 14, 1980 homicide as part of a "package deal." The defendant was not unaware of the true purpose behind the troopers' requests for ballistics testing. He testified that "they didn't say 'give us the gun so we can convict you.' They said, 'Give us the gun so that we can clear you.' " He denied that he had confessed at all, and maintained that he had asked the troopers to tape record the interview sessions "so there would be no discrepancies later on."

"On appeal, in order to determine whether the defendant's constitutional rights have been infringed, we review the record in its entirety and are not limited to the evidence before the trial court at the time the ruling admitting the statements was made." *State* v. *Toste,* supra, 576. Our review of the defendant's testimony at trial, including his lengthy cross-examination by the state's attorney, objectively demonstrates him to be an individual not easily dominated or overborne. This is not to suggest that Cavanaugh and Reid actively exerted such coercive pressures against the defendant as to violate due process in their efforts to obtain his

confession. The trial court found, and the defendant later testified, that he was not threatened or physically abused at any time during his interrogation. The defendant at all times was adequately provided with food, drink and rest. On the day before Cavanaugh and Reid began to interrogate him, the defendant had been presented in Federal District Court. At the end of the first interrogation session, which lasted little more than two hours, the defendant asked to call his wife, and the troopers made the necessary arrangements with jail officials. The troopers were not present during the call. The interview on the following day, when the defendant confessed, lasted for only an hour. The defendant was provided with cigarettes and the troopers deposited money with jail officials for the defendant's account. On the third day, the defendant was again taken to Federal District Court and released to the state of Alabama. He was then interviewed in the federal courthouse by Cavanaugh and Reid from 11:50 a.m. until 2 p.m. Finally, on the fourth day, July 15, 1980, the defendant was presented in Alabama state court at 10:15 a.m., where he waived extradition to Connecticut and was remanded to the custody of Cavanaugh and Reid.

Considering the totality of the circumstances, we believe that the trial court's finding on voluntariness is supported by substantial evidence. The defendant's suggestion in his brief that his confession may have been induced by the troopers' representations that he could be cleared by ballistics testing on the gun is simply not supported by the record. It is clear from the defendant's testimony that he was not at all influenced by what was at best a half-truth, and at worst, a transparent and clumsy ploy. The defendant knew that he had destroyed the gun and therefore he could not seriously have entertained any thought that ballistics testing might clear him. Moreover, the defendant, in fact, revealed noth-

ing about the gun during the first interview when the interrogators actively pursued the "ballistics" inducement. The relative brevity of the interview sessions interspersed between court appearances, the defendant's age, intelligence, and his experience with the criminal justice system, and the absence of any overt forms of abusive conduct by Cavanaugh and Reid, sufficiently support the trial court's conclusion that the defendant's incriminating statements were given voluntarily.

## IV

### WAIVER OF *Miranda* RIGHTS

We next address the defendant's claim that the state failed to prove that he knowingly and intelligently waived his *Miranda* rights prior to the initiation of custodial interrogation. The defendant bases this claim on the fact that he expressly refused to sign the waiver portion of the standard advisement form used by Cavanaugh and Reid, and on the fact that he expressly stated that he would not make a written statement.

Absent an express waiver, the prosecution bears a heavy burden to demonstrate that the defendant "voluntarily, knowingly and intelligently" waived his right to remain silent and his right to counsel during custodial interrogation. *Miranda* v. *Arizona,* supra, 444, 475. As in every case, the waiver must have been made "with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran* v. *Burbine,* 475 U.S. 412, 106 S. Ct. 1135, 1141, 89 L. Ed. 2d 410 (1986). Thus, while an "express written or oral statement of waiver . . . is not inevitably either necessary or sufficient to establish waiver" of *Miranda* rights; *North Carolina* v. *Butler,* supra, 373; the state must demonstrate: "(1) that the defendant *understood* his rights, and (2) that the defendant's *course of conduct* indicated that he did, in

fact, waive those rights." (Emphasis in original.) *State v. Wilson,* 183 Conn. 280, 285, 439 A.2d 330 (1981); see *Tague* v. *Louisiana,* 444 U.S. 469, 470, 100 S. Ct. 652, 62 L. Ed. 2d 622 (1980).

In the present case, the defendant affirmatively indicated his refusal to waive his *Miranda* rights by writing the words "refused to sign" on the signature line of the standard waiver form. He nonetheless conceded on direct examination at trial that he did in fact agree to speak with Cavanaugh and Reid. He also conceded that he understood his *Miranda* rights, and, specifically, that he understood that any oral statements he made to Cavanaugh and Reid could be used against him in court. According to both Cavanaugh and Reid, the defendant stated that he would not sign the waiver form because he did not want to give a written statement and because he "wanted to hold something back" so as not to jeopardize a possible "package deal."

We find it difficult to reconcile the defendant's conceded understanding of his *Miranda* rights with the equally undisputed fact that he would not waive those rights while agreeing to make incriminating oral admissions to his interrogators. This court, however, has been confronted with similar situations in *State* v. *Harris,* 188 Conn. 574, 452 A.2d 634 (1982), cert. denied, 460 U.S. 1089, 103 S. Ct. 1785, 76 L. Ed. 2d 354 (1983), where the defendant made incriminating oral admissions despite his refusal to sign a written waiver and despite his unwillingness "to make a written statement before consultation with a lawyer"; id., 578; in *State* v. *Derrico,* 181 Conn. 151, 434 A.2d 356, cert. denied, 449 U.S. 1064, 101 S. Ct. 789, 66 L. Ed. 2d 607 (1980), where the defendant, after an initial "hesitancy" to sign the waiver form, immediately mutilated it after he had made a confession; id., 163; and in *State* v. *Frazier,* 185 Conn. 211, 440 A.2d 916 (1981), cert. denied, 458 U.S. 1112, 102 S. Ct. 3496, 73 L. Ed. 2d 1375 (1982),

where the defendant agreed to make an oral, but not a written statement to police. Id., 225; see also *State v. Pecoraro,* 198 Conn. 203, 207–209, 502 A.2d 396 (1985) (where waiver was implied from the defendant's exercise of his right to cut off further questioning). While the refusal to sign a written waiver or written statement is a "relevant factor in determining whether an individual knowingly, intelligently, and voluntarily waived his privilege"; *State v. Derrico,* supra, 165; it is not controlling and "may be outweighed by affirmative conduct indicative of a knowingly and intelligently made decision not to remain silent." *State v. Harris,* supra, 581. Under the circumstances of this case, we believe that the defendant's unequivocal understanding that anything he said could be used against him in a subsequent trial, coupled with his express agreement to speak with Cavanaugh and Reid, constitute the "requisite level of comprehension"; *Moran v. Burbine,* supra, 1141; and the "explicit affirmative act"; *State v. Harris,* supra, 580; necessary to sustain the trial court's finding that the defendant waived his *Miranda* rights. We have noted that it is " 'a common experience of life that in many circumstances persons are willing to convey information orally but are reluctant to put the same thing in writing.' " *State v. Frazier,* supra, 225, quoting *United States v. Cooper,* 499 F.2d 1060, 1062 (D.C. Cir. 1974). The defendant's expressed desire to "hold something back" by not giving a written statement is not entirely inconsistent with a knowing and intelligent waiver of his right to remain silent when viewed in relation to his background and experience with the criminal justice system. A written and signed confession is obviously a more reliable form of evidence than the uncorroborated and often disputed testimony of the interrogating officers. Although the defendant did not testify at the pretrial hearing on his motion to suppress, he testified at trial and denied that

he had ever confessed. Under these circumstances, we find that the trial court properly concluded that the defendant knowingly, intelligently and voluntarily waived his *Miranda* rights.

## V

### FIFTH AMENDMENT RIGHT TO COUNSEL

We next address the matter of the "package deal" and the defendant's claim that he constructively invoked his fifth amendment right to counsel. Cavanaugh and Reid testified that on the first day of interrogation, July 12, 1980, as they discussed with the defendant the various charges listed against him on the NCIC "rap sheet," the defendant told them he would like to have all his charges resolved in a single "package deal." The troopers further testified that the defendant stated that such a deal might be arranged between an attorney, who had represented him in the past, and the state's attorney, upon his return to Connecticut. As we have previously stated, the defendant testified at trial that it was Cavanaugh who suggested the possibility of a "package deal" as an inducement to the defendant to confess to the February 14, 1980 homicide. The defendant's testimony, however, was not before the trial court when it ruled on the motion to suppress, and the court expressly found, as the troopers testified, that the defendant had initiated the discussion about a "package deal." The defendant on appeal has briefed his claim in reliance on the trial court's finding, which we find to be supported by "substantial evidence"; *State* v. *Pellegrino,* 194 Conn. 279, 288–89, 480 A.2d 537 (1984); *State* v. *Harris,* supra, 580; namely, the testimony of Cavanaugh and Reid. We therefore consider this claim on the facts as found by the trial court.

The defendant relies on *State* v. *Barrett,* 197 Conn. 50, 495 A.2d 1044 (1985), in contending that his expres-

sion of a desire to have his charges resolved in a "package deal" arranged by his former attorney and the state's attorney, constituted a constructive invocation of his right to counsel. Our holding in *Barrett,* however, cannot be construed to govern the present case. The defendant in *Barrett,* upon his arrival at the police station and after he had been advised of his *Miranda* rights, was asked if he would be willing to give a statement. He "immediately replied that he would not give a written statement without his attorney present, although he was willing to answer questions orally." Id., 55. The defendant had made several phone calls from the police station, and at least one of the interrogating officers assumed that the defendant had contacted an attorney, and that the attorney was on his way. Thus, the record was "clear that the police *understood*" that the defendant had requested counsel. (Emphasis added.) Id., 56. Moreover, the police were "aware that the defendant had never been arrested before and was unfamiliar with police procedure." Id., 57 n.9. We held that, under those circumstances, the defendant's refusal to give a written statement as he awaited the arrival of his attorney was a "clear request for the assistance of counsel" during custodial interrogation. Id., 57.

The clarity we found in the circumstances of *Barrett* is lacking in the present case, and the importance of this essential distinction cannot be overstated. *Miranda* establishes a set of specific procedural guidelines for police to follow in their dealings with a suspect during custodial interrogation. Any incriminating admissions obtained by police in violation of *Miranda's* guidelines may not be used against the defendant, at least during the state's case-in-chief. *Harris* v. *New York,* 401 U.S. 222, 224, 91 S. Ct. 643, 28 L. Ed. 2d 1 (1971). The *Miranda* exclusionary rule, however, "sweeps more broadly than the Fifth Amendment

itself," and thus may require the suppression of reliable evidence "even in the absence of a Fifth Amendment violation." *Oregon* v. *Elstad,* supra, 306. "Whatever the defects, if any, of this relatively rigid requirement that interrogation must cease upon the accused's request for an attorney, *Miranda's* holding has the virtue of informing police and prosecutors with specificity as to what they may do in conducting custodial interrogation, and of informing courts under what circumstances statements obtained during such interrogation are not admissible. This gain in specificity, which benefits the accused and the State alike, has been thought to outweigh the burdens that the decision in *Miranda* imposes on law enforcement agencies and the courts by requiring the suppression of trustworthy and highly probative evidence even though the confession might be voluntary under traditional Fifth Amendment analysis." *Fare* v. *Michael C.,* 442 U.S. 707, 718, 99 S. Ct. 2560, 61 L. Ed. 2d 197, reh. denied, 444 U.S. 887, 100 S. Ct. 186, 62 L. Ed. 2d 121 (1979); see *Michigan* v. *Tucker,* 417 U.S. 433, 443–46, 94 S. Ct. 2357, 41 L. Ed. 2d 182 (1974).

The boundaries of what may be considered an invocation of the right to counsel are often difficult to define, and in many cases, the question may depend on whether police knew or should have known that the right had been invoked. The Supreme Court has found that the right to counsel was successfully invoked where the defendant, when informed of his right to have an attorney present, responded, "[Y]eah. I'd like to do that"; *Smith* v. *Illinois,* 469 U.S. 91, 93, 105 S. Ct. 490, 491, 83 L. Ed. 2d 488 (1984); as well as where the defendant, after a telephone conversation with a county attorney, told police, "I want an attorney before making a deal." *Edwards* v. *Arizona,* 451 U.S. 477, 479, 101 S. Ct. 1880, 68 L. Ed. 2d 378, reh. denied, 452 U.S. 973, 101 S. Ct. 3128, 69 L. Ed. 2d 984 (1981); see also

*Brewer* v. *Williams,* 430 U.S. 387, 405, 97 S. Ct. 1232, 51 L. Ed. 2d 424 (1977) ("statements . . . that he would tell the whole story *after* seeing [his attorney] were the clearest expressions by [the defendant] himself that he desired the presence of an attorney before any interrogation took place" [emphasis in original]); *State* v. *Moscone,* 171 Conn. 500, 503, 370 A.2d 1030 (1976) (" 'defendant stated that he would not say anything *until he saw his lawyer'* " [emphasis in original]). The defendant in *Barrett* explicitly conditioned his consent to give a written statement on prior consultation with his attorney. The police were aware that the attorney would arrive shortly, and that the defendant, who was unfamiliar with stationhouse interrogation, sought to rely on his attorney's immediate advice. The police thus knew, or should have known, that the defendant had invoked his right to counsel, and that their continued efforts to extract a written statement were taken in direct violation of *Miranda.* See *State* v. *Williams,* 190 Conn. 104, 112–13, 459 A.2d 510 (1983). In such a case the police should expect that the state will not benefit by the fruits of their unlawful activity.

Where circumstances are such as to reasonably apprise the interrogating officers that an accused may have invoked his right to counsel, the officers must "clarify his intention rather than proceed to question him." *State* v. *Barrett,* supra, 56; *State* v. *Acquin,* 187 Conn. 647, 672–75, 448 A.2d 163 (1982), cert. denied, 463 U.S. 1229, 103 S. Ct. 3570, 77 L. Ed. 2d 1411 (1983). We have noted, however, that not every reference to an attorney during custodial interrogation is an invocation of the right to counsel. *State* v. *Wilson,* 199 Conn. 417, 443, 513 A.2d 620 (1986). In the present case, the defendant did not explicitly condition further discussion of the proposed "package deal," or any other topic, on prior consultation with his attorney. Rather, the defendant indicated that he wanted to make a

"package deal" before discussing the handgun, and before "copping out" to the February 14, 1980 homicide, although he recognized that such a deal ultimately could not be concluded in the absence of formal plea negotiations involving his attorney in Connecticut. While these facts may properly comprise a claim that the defendant invoked his right to remain silent, an issue we presently consider, we believe that it would be an unwarranted extension of our holding in *Barrett* to find that the defendant constructively invoked his right to counsel when he mentioned his attorney while discussing a "package deal." Such a finding would substantially negate *Miranda's* clarity in informing police, prosecutors and courts of the permissible limits of police conduct during custodial interrogation. *Fare* v. *Michael C.,* supra; see also *Moran* v. *Burbine,* supra; *Berkemer* v. *McCarty,* 468 U.S. 420, 430, 104 S. Ct. 3138, 82 L. Ed. 2d 317 (1984). Under the circumstances of this case, we do not believe that Cavanaugh and Reid should be expected to have understood the defendant's reference to an attorney as an expression of his desire to deal with them further only through counsel. We therefore find that the defendant did not invoke his fifth amendment right to counsel.

## VI

### RIGHT TO REMAIN SILENT

The defendant claims that Cavanaugh and Reid violated his *Miranda* rights by continuing to question him after he had invoked his right to remain silent. The relevant portion of *Miranda* reads as follows: "Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person

invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has once been invoked." *Miranda* v. *Arizona,* supra, 473–74. The Supreme Court has further held that "the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.' " *Michigan* v. *Mosely,* 423 U.S. 96, 104, 96 S. Ct. 321, 46 L. Ed. 2d 313 (1975).

We start from the premise that Cavanaugh and Reid violated *Miranda* during the first interrogation session on July 12, 1980 when they continued to question the defendant about the Basque .380 handgun after he had told them that he did not want to talk about it. "[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response . . . ." *Rhode Island* v. *Innis,* 446 U.S. 291, 301, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980). The troopers' attempts to induce the defendant to "clear" himself by submitting the gun for ballistics testing most certainly qualify under that definition. The defendant had clearly informed the troopers that he did not want to discuss the gun until his return to Connecticut, where he believed he would have the chance to negotiate a "package deal."

Our determination that Cavanaugh and Reid violated *Miranda* leaves unresolved the question of "how sweeping the judicially imposed consequences" of a failure to respect the right to remain silent should be. *Michigan* v. *Tucker,* 417 U.S. 433, 445, 94 S. Ct. 2357, 41 L. Ed. 2d 182 (1974). Clearly, the trial court should have suppressed the defendant's statements given during

the first interrogation session, on July 12, 1980, when the *Miranda* violation occurred. The difficult question, however, is whether the defendant's actual confession, which was not obtained until the *following day*, should also have been suppressed. Our traditional approach to this question has been to presume that an incriminating statement obtained in violation of *Miranda* impermissibly taints a subsequent confession unless the prosecution can show a sufficient " 'break in the stream of events' " so as to justify admission of the subsequent confession. *State* v. *Derrico,* 181 Conn. 151, 166, 434 A.2d 356, cert. denied, 449 U.S. 1064, 101 S. Ct. 789, 66 L. Ed. 2d 607 (1980), quoting *Darwin* v. *Connecticut,* 391 U.S. 346, 350–51, 88 S. Ct. 1488, 20 L. Ed. 2d 630 (1968) (Harlan, J., concurring in part and dissenting in part); *State* v. *Rosa,* 170 Conn. 417, 425 n.5, 365 A.2d 1135, cert. denied, 429 U.S. 845, 97 S. Ct. 126, 50 L. Ed. 2d 116 (1976). The Supreme Court, however, in distinguishing an "ordinary" *Miranda* violation from a violation of the "Fifth Amendment itself," has rejected the view that a subsequent knowing and voluntary confession should be considered the "tainted fruit" of a *Miranda* violation. *Oregon* v. *Elstad,* 470 U.S. 298, 105 S. Ct. 1285, 84 L. Ed. 2d 222 (1985). In *Elstad,* the police interrogated the defendant and obtained his confession without giving him *Miranda* warnings. One hour later, after he had been properly warned, the defendant confessed again. The Supreme Court refused to apply the familiar analyses of *Wong Sun* v. *United States,* 371 U.S. 471, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963) ("fruit of the poisonous tree"), and *United States* v. *Bayer,* 331 U.S. 532, 67 S. Ct. 1394, 91 L. Ed. 1654 (1947) ("cat out of the bag"), in determining the admissibility of the derivative confession. Reasoning that errors made by police "in administering the prophylactic *Miranda* procedures . . . should not breed the same irremedial consequences as

police infringement of the Fifth Amendment itself";
*Oregon* v. *Elstad,* supra, 309; the court held that the
"admissibility of any subsequent statement should turn
in these circumstances solely on whether it [was] know-
ingly and voluntarily made." Id.

We recognize that *Elstad* draws a distinction between
the "simple failure to administer the warnings, unac-
companied by any actual coercion"; id.; and more seri-
ous *Miranda* violations where police have employed
" 'improper tactics' or 'inherently coercive methods'
that are 'calculated to undermine the suspect's ability
to exercise his free will.' " *Oregon* v. *Elstad,* supra, 342
(Brennan, J., dissenting). In the present case it might
be argued that the failure of Cavanaugh and Reid to
respect the defendant's wishes ultimately eroded his
capacity for self-determination and convinced him that
further resistance would be futile. The trial court, how-
ever, found that the defendant's confession was given
voluntarily, and we have already determined that its
finding is supported by substantial evidence. Even if
we were to find that the "surrounding circumstances
and the entire course of police conduct" during the ini-
tial interrogation were such as to render the defend-
ant's statements involuntary; *Oregon* v. *Elstad,* supra,
318; we would nonetheless find, under our traditional
analysis, a sufficient " 'break in the stream of events' "
as to justify the admission of his subsequent confession.
*State* v. *Derrico,* supra, 166. In assessing the causal
connection between an involuntary statement and a
subsequent confession, courts have considered the tem-
poral proximity of the illegality and the confession, the
presence of intervening circumstances, and the
flagrancy of the official misconduct. *Taylor* v. *Alabama,*
457 U.S. 687, 690, 102 S. Ct. 2664, 73 L. Ed. 2d 314
(1982); *Brown* v. *Illinois,* 422 U.S. 590, 603–604, 95
S. Ct. 2254, 45 L. Ed. 2d 416 (1975); *Robinson* v. *Percy,*
738 F.2d 214, 221 (7th Cir. 1984). When the relation

between the illegality and subsequent confession is " 'so close that one must say the facts of one control the character of the other' the subsequent confession will be suppressed." *Holleman* v. *Duckworth,* 700 F.2d 391, 396 (7th Cir.), cert. denied, 464 U.S. 834, 104 S. Ct. 116, 78 L. Ed. 2d 116 (1983), quoting *Leyra* v. *Denno,* 347 U.S. 556, 561, 74 S. Ct. 716, 98 L. Ed. 948 (1957).

The only incriminating statement made during the initial interrogation session came when the defendant, in response to a question by Cavanaugh, stated that the proposed "package deal" would include the February 14, 1980 homicide. The defendant steadfastly refused to divulge the location of the Basque .380 handgun. The first interrogation session ended at approximately 4:40 p.m. on July 12, 1980, and the troopers did not return until approximately twenty-four hours later, at 4 p.m. on July 13, 1980. In the interim the defendant had spoken with his wife, eaten several meals, and slept a night without disturbance. Before resuming questioning, the troopers gave the defendant fresh *Miranda* warnings, which he concedes he understood. We have already determined that the defendant knowingly, intelligently and voluntarily waived his *Miranda* rights despite his refusal to sign the waiver form. In view of the totality of the circumstances, we find that the defendant's confession on July 13, 1980, was sufficiently purged of the previous day's *Miranda* violations.

## VII

### RESUMPTION OF QUESTIONING

Our determination that the defendant's confession was not infected with the taint of the July 12, 1980 *Miranda* violations does not address the question of whether Cavanaugh and Reid violated *Miranda* anew when, on July 13, 1980, they produced a photograph of the defendant's gun collection and asked him to iden-

tify the murder weapon. There can be little doubt that this procedure constituted "words or *actions* . . . that the police should know are reasonably likely to elicit an incriminating response . . . ." (Emphasis added.) *Rhode Island* v. *Innis,* supra, 301; see *Anderson* v. *Smith,* 751 F.2d 96, 104 (2d Cir. 1984), and cases cited therein. Cavanaugh and Reid thus reinterrogated the defendant about the very matter as to which he had exercised his right to remain silent on the previous day. Under these circumstances, the admissibility of the defendant's confession on July 13, 1980, "depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.' " *Michigan* v. *Mosely,* 423 U.S. 96, 104, 96 S. Ct. 321, 46 L. Ed. 2d 313 (1975).

As we have previously determined, the defendant's right to cut off questioning about the gun was not scrupulously honored during the initial interrogation session on July 12, 1980. The requirement that police respect a person's exercise of his right to remain silent "counteracts the coercive pressures of the custodial setting" by affirmatively indicating to the suspect that "he can control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation." Id., 103–104. Thus, while "[s]crupulously honoring a suspect's rights for a few hours does not lessen the impact of subsequent coercive questioning"; *Anderson* v. *Smith,* supra, 102–103; the United States Supreme Court has stated that *Miranda* cannot "sensibly be read to create a *per se* proscription of indefinite duration upon any further questioning by any police officer on any subject, once the person in custody has indicated a desire to remain silent." *Michigan* v. *Mosely,* supra, 102–103.

While *Mosely* was not a case "where the police failed to honor a decision of a person in custody to cut off

questioning . . . by persisting in repeated efforts to wear down his resistance"; id., 105–106; we do not believe that the course of events during the initial interrogation session were such as to wear down the defendant's resistance and coerce him into speaking about the gun. That session lasted little more than two hours, and at its conclusion the defendant had not told the troopers anything about the gun or otherwise confessed to the February 14, 1980 homicide. The troopers' circuitous maneuvers to learn of the gun through the dubious ruse of ballistics testing, while not to be applauded, were markedly less oppressive than repeated direct questioning in total disregard of the defendant's right to remain silent. Moreover, the defendant's own testimony indicates that he was not influenced or deceived. Thus, while his right to cut off questioning about the gun was not observed when it should have been, it was honored a very short time thereafter when the interview ended, and the troopers did not resume interrogation until nearly twenty-four hours later. This case is therefore distinguishable from *Anderson* v. *Smith,* supra, 102, where, after the defendant had invoked his right to remain silent, the "interrogator plowed ahead" until he had elicited an incriminating response. Under the circumstances of this case, it is difficult to conclude that the defendant's will to resist was critically impaired by what occurred during the initial interrogation session, or that he believed that the course and subject matter of the interrogation was beyond his control. *Michigan* v. *Mosely,* supra, 103–104. We therefore hold that Cavanaugh and Reid did not violate *Miranda* when they resumed questioning about the gun at the start of the second interrogation session on July 13, 1980, and we conclude that admission of the defendant's July 13, 1980 confession into evidence did not violate *Miranda,* its progeny, or the fifth amendment proper.

## VIII

### Fourth Amendment

The defendant's final claim with respect to the admissibility of his confession is raised under the fourth amendment. Cavanaugh and Reid began the July 13, 1980 interrogation session by showing the defendant a photograph which had been seized during the March 21, 1980 search of his apartment. The photograph displayed a gun collection with the defendant standing beside it. Cavanaugh asked the defendant to identify the Basque .380 handgun in the photograph, and the defendant did so. Soon thereafter he confessed.

The defendant contends that the search of his apartment was unsupported by probable cause and hence violative of the fourth amendment. We agree. He next contends that the photograph was the "tainted fruit" of that search; *Wong Sun* v. *United States,* supra; and again we agree. We cannot agree, however, with his further contention that his viewing of the unlawfully seized photograph caused him to confess.

"In reviewing a search warrant affidavit the court 'must ascertain whether the facts in the affidavit are sufficient to justify an independent determination by a neutral and detached issuing judge that the necessary probable cause exists for the issuance of the warrant. *State* v. *Williams,* 169 Conn. 322, 326, 363 A.2d 72 (1975); *State* v. *Rose,* 168 Conn. 623, 627–28, 362 A.2d 813 (1975); *State* v. *Allen,* 155 Conn. 385, 391, 232 A.2d 315 (1967).' *State* v. *DeChamplain,* 179 Conn. 522, 527–28, 427 A.2d 1338 (1980); see *State* v. *Arpin,* 188 Conn. 183, 193, 448 A.2d 1334 (1982). 'Probable cause to search exists if: (1) there is probable cause to believe that the particular items sought to be seized are connected with criminal activity or will assist in a particular apprehension or conviction . . . *and* (2) there

is probable cause to believe that the items sought to be seized will be found in the place to be searched.' (Emphasis in original; citations omitted.) *State* v. *DeChamplain,* supra, 528–29; see *State* v. *Arpin,* supra. The reviewing court may consider only the information that was actually before the issuing judge at the time he or she signed the warrant. *Aguilar* v. *Texas,* 378 U.S. 108, 109 n.1, 84 S. Ct. 1509, 12 L. Ed. 2d 723 (1964); *Giordenello* v. *United States,* 357 U.S. 480, 486, 78 S. Ct. 1245, 2 L. Ed. 2d 1503 (1958); *State* v. *Jackson,* 162 Conn. 440, 443, 294 A.2d 517, cert. denied, 409 U.S. 870, 93 S. Ct. 198, 34 L. Ed. 2d 121 (1972)." *State* v. *Delmonaco,* 194 Conn. 331, 337, 481 A.2d 40, cert. denied, 469 U.S. 1036, 105 S. Ct. 511, 83 L. Ed. 2d 401 (1984).

The allegations in the warrant affidavit have previously been set forth. Viewing those allegations, and all reasonable inferences drawn therefrom, in the light most favorable to a finding of probable cause, the issuing judge may reasonably have reached the following conclusions. The defendant possessed a Basque .380 handgun of the same type used to kill the victim, and given human nature, he most likely kept it in or near his apartment. The defendant had not gone to work on the day of the crime. He was familiar with the area where the victim was last seen because his in-laws lived nearby. The victim had been sexually assaulted before she was murdered, and the defendant very recently had been identified as having *committed* two violent sexual assaults. Both sexual assaults were accomplished at knifepoint, and while neither victim was killed, one had been strangled and left for dead. Finally, the defendant had committed an "armed" robbery several years before, and considering all the circumstances, was an individual dangerously prone to violence.

In attempting to reconstruct the situation as it must have appeared to the police and issuing judge, we have

broadly construed the allegations in the affidavit. Assuming, as we must, the truth of those allegations, we believe that they portray the defendant as an individual who should be watched, feared, avoided, and even arrested, on separate charges of sexual assault arising from the Greenwich and Fairfield incidents. We do not, however, believe that those allegations and all reasonable inferences arising from them can be read to give the police probable cause to search the defendant's apartment.

The affidavit sets forth sufficient facts to sustain a reasonable belief that the defendant possessed the Basque .380, and the issuing judge could reasonably have inferred that the defendant kept it in his apartment. But probable cause to search requires more than a reasonable belief that the item to be seized will be found in the place to be searched—also required is a reasonable belief that the items to be seized are " 'connected with criminal activity.' " *State* v. *Delmonaco,* supra, 337. There is no indication in the affidavit that the Basque .380 is a particularly rare gun, or if not rare, that it is owned by only a small circle of persons in the local area. Nor is there an allegation that the defendant was in the vicinity of the crime on February 14, 1980. The fact that he was familiar with the general area because his in-laws lived nearby hardly supports a reasonable belief that he was there that day. We note that under the circumstances of this case, probable cause to believe that the defendant's gun was the murder weapon is the same as probable cause to arrest him for murder. The quantum of evidence necessary to justify official action in either case would be the same. *State* v. *DeChamplain,* supra, 529 n.7; 1 LaFave, Search and Seizure (1978) § 3.1 (b). Viewed from this perspective, it is clear that the police had no probable cause to search the defendant's apartment.

The fact that the defendant had been identified as having recently committed two sexual assaults gave police probable cause to arrest him for those crimes. But in the absence of similar methods of commission or other common features between otherwise unrelated crimes, we will not adopt a theory of probable cause which comes to depend on whatever inferences are drawn by police from the fact that the suspect is, or may be, on a "crime spree." By focusing on general criminal propensity rather than on the individual facts and circumstances known about the crime under investigation, such theory eventually would erode away most fourth amendment protections while doing little to ensure the arrest of the person who actually committed the crime. That the defendant had not gone to work on February 14, 1980, that he was known to possess a Basque .380 handgun, and that he had recently committed two other sexual assaults, all gave the police strong reason to suspect him of the murder. But as we have stated, " 'common rumor or report, suspicion, or even strong reason to suspect, are not sufficient to constitute probable cause . . . .' " *State* v. *Saidel,* 159 Conn. 96, 100, 267 A.2d 449 (1970); *Henry* v. *United States,* 361 U.S. 68, 101, 80 S. Ct. 168, 4 L. Ed. 2d 134 (1959).

" ' "There is often a fine line between mere suspicion and probable cause" ' "; *State* v. *Dennis,* 189 Conn. 429, 431, 456 A.2d 333 (1983); *State* v. *Magnotti,* 198 Conn. 209, 213, 502 A.2d 404 (1985); but that line must nonetheless be drawn. "[P]hysical entry of the home is the chief evil against which the . . . Fourth Amendment is directed," and "unless Government safeguards its own capacity to function and to preserve the security of its people, society itself could become so disordered that all rights and liberties would be endangered." *United States* v. *United States District Court,* 407 U.S. 297, 312, 313, 92 S. Ct. 2125, 32 L. Ed. 2d 752 (1972).

The defendant was entitled to this security, as any other citizen, unless the entry of his home—and the rummaging by police through his private possessions—was justified by a warrant supported by probable cause. *Payton v. New York,* 445 U.S. 573, 588–89, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980). In this case, there was insufficient probable cause to justify issuance of the warrant, and, therefore, the search violated the fourth amendment.

Since the search of the defendant's apartment violated the fourth amendment, the fruits of that search should not have been admitted against him at trial. *Wong Sun* v. *United States,* supra. Moreover, Cavanaugh and Reid should not have had the use of the illegally seized photograph during their interrogation of the defendant. "In the typical case in which the defendant . . . was confronted by the police with evidence they had illegally seized, it is apparent that there has been an 'exploitation of that illegality' when the police subsequently question the defendant about the evidence or the crime to which it relates. This is because 'the realization that the "cat is out of the bag" plays a significant role in encouraging the suspect to speak.' " 3 LaFave, supra, § 11.4 (c), p. 639; see *Anderson* v. *Smith,* 751 F.2d 96, 104 (2d Cir. 1984), and cases cited therein. For the following reasons, however, we do not believe that the present case is the "typical case" or that the photograph played a "significant role" in inducing the defendant to confess.

The defendant was aware that his apartment had been searched because he was there when the police arrived. He did not leave the state until three days later, and even after he left, he maintained contact with his cousin, Edward Reskus, who kept him informed of police efforts to locate him and the Basque .380 handgun. The defendant was thus aware that the police knew that he possessed a Basque .380 handgun, and

that they were interested in its recovery, even before the commencement of interrogations on July 12, 1980. Thus, the "cat" was already long "out of the bag" when the troopers produced the illegally seized photograph and asked the defendant to identify the murder weapon. Moreover, this is not a case where the suspect has been confronted with evidence incriminatory in itself, e.g., narcotics, which has been illegally seized from his possession. The photograph of the gun collection was essentially neutral, considering what the defendant already knew, and in effect, was nothing more than an alternative form of "interrogation." We have previously determined that Cavanaugh and Reid did not violate *Miranda* or *Mosely* when they interrogated the defendant about the gun during the second interview on July 13, 1980. For purposes of the fourth amendment, we also believe that the defendant's confession was "sufficiently an act of free will to purge the primary taint" of the illegal search. *Wong Sun* v. *United States,* supra, 486; *United States* v. *Parker,* 722 F.2d 179, 186 (5th Cir. 1983). We therefore conclude that the defendant's confession was not obtained in violation of the fourth amendment and, as a result, the trial court did not err in admitting it into evidence.

## IX

### HARMLESS ERROR

We have determined that various evidence in this case was illegally obtained, and therefore, not properly admissible at the defendant's trial. Specifically, we refer to: (1) the defendant's statements made during the July 12, 1980 interrogation session after he had invoked his right to remain silent about the gun; and (2) the products of the search of his apartment on March 21, 1980. We must now determine the disposition of this case in light of the improper admission of this evidence at the defendant's trial.

With regard to the fourth amendment violation, the state argues that the police conducted the March 21, 1980 search in "good faith" reliance on a warrant signed by a neutral and detached magistrate, and that under such circumstances, federal law no longer requires exclusion of the illegally seized evidence. *United States* v. *Leon,* 468 U.S. 897, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984). The defendant, on the other hand, argues that we should order the suppression of this evidence under article first, § 7, of the Connecticut constitution to ensure the protection of " 'the full panoply of rights Connecticut residents have come to expect as their due.' " *State* v. *Kimbro,* 197 Conn. 219, 234 n.16, 496 A.2d 498 (1985), quoting *Horton* v. *Meskill,* 172 Conn. 615, 642, 376 A.2d 359 (1977). In the present case, however, we need not decide the proper consequences of a fourth amendment violation because under the circumstances we find that the erroneous admission into evidence of the fruits of the search was harmless beyond a reasonable doubt. *Chapman* v. *California,* 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705, reh. denied, 386 U.S. 987, 87 S. Ct. 1283, 18 L. Ed. 2d 241 (1967).

"While the violation of certain constitutional rights automatically amounts to harmful error . . . the violation of others, such as the admission of evidence obtained in violation of the Fourth Amendment, does not. *Bumper* v. *North Carolina,* 391 U.S. 543, 550, 88 S. Ct. 1788, 1792, 20 L. Ed. 2d 797 (1968); *Fahy* v. *Connecticut,* 375 U.S. 85, 84 S. Ct. 229, 11 L. Ed. 2d 171 (1963)." *United States* v. *Molt,* 615 F.2d 141, 145 (3d Cir. 1980). The " 'harmlessness of an error depends upon its impact on the trier and the result' "; *State* v. *Ortiz,* 198 Conn. 220, 225, 502 A.2d 400 (1985), quoting *State* v. *Bruno,* 197 Conn. 326, 336, 497 A.2d 758 (1985) (*Shea, J.,* concurring); and the test is whether "there is a reasonable possibility that the improperly

admitted evidence contributed to the conviction." *Schneble* v. *Florida,* 405 U.S. 427, 432, 92 S. Ct. 1056, 31 L. Ed. 2d 340 (1972). The improperly admitted evidence in this case consisted of an empty gunbox with "Basque" inscribed on its top; a gun cleaning rod; warranty and receipt papers; and two photographs of the defendant standing beside his gun collection. This evidence was introduced to show that the defendant possessed a Basque .380 handgun; but in view of the other evidence introduced on this issue at trial, particularly the defendant's confession and his admission that he had melted down the gun with a blowtorch at his former place of employment, we believe that the gun box, related paraphernalia and the photographs were merely cumulative. *Holton* v. *Newsome,* 750 F.2d 1513, 1516 (11th Cir. 1985); *United States* v. *Lomas,* 706 F.2d 886, 894 (9th Cir. 1983). Because the admissible evidence at trial relating to the defendant's possession of the gun was overwhelming, we hold that the admission into evidence of the fruits of the search could not possibly have affected the jury's judgment in this case.

We find the same to be true with respect to the defendant's incriminating admissions made during the initial interrogation session on July 12, 1980. We have noted that a confession, if sufficiently corroborated, is the "most damaging evidence of guilt"; *State* v. *Ruth,* 181 Conn. 187, 199, 435 A.2d 3 (1980); *State* v. *Vaughn,* 171 Conn. 454, 460, 370 A.2d 1002 (1976); and in the usual case will constitute the "overwhelming evidence" necessary to render harmless many errors at trial. See *Milton* v. *Wainwright,* 407 U.S. 371, 372, 92 S. Ct. 2174, 33 L. Ed. 2d 1 (1972); *Robinson* v. *Percy,* 738 F.2d 214, 220 (7th Cir. 1984). The defendant's intimate knowledge of the details of this crime, his flight from the state, and his destruction of the Basque .380 handgun, all provide strong corroboration for his confession. We conclude that the defendant's confession of July 13,

1980, together with admissions made on the following days, constitute the overwhelming evidence of guilt necessary to eliminate any reasonable possibility that the jurors were influenced by the improper admission of his statements made on July 12, 1980.

## X

### JURY INSTRUCTIONS

The defendant's final claim is that the trial court erred in its instructions to the jury on the admissibility of his confession. He claims specifically that a single portion of the charge assumes as a fact that the defendant confessed to Cavanaugh and Reid, and thereby removed that issue from the jury's consideration. As previously noted, the defendant testified at trial and denied that he had made a confession. The defendant took a proper exception to the following portion of the charge: "You will recall that the State offered in evidence testimony as to oral statements made out of court to the police by the accused, which it claims were in the nature of the confessions or admissions, tending to show his guilt of the crime charged. Out of your presence, I considered the question of their admissibility. I did hold that testimony to be admissible. Let me now caution you that this ruling on my part meant no more than the circumstances surrounding the making of those statements were such that you should have before you for your consideration, the statements."

The trial court clearly had no business informing the jury of matters decided out of their presence. The reason that a hearing on voluntariness is held out of the jury's presence is so that they will not know about it. It was not necessary for the trial court to inform the jury that it had ruled the confession admissible. Credibility was the critical issue at trial, with the testimony of Cavanaugh and Reid on the one hand posed against

the defendant's on the other. The obvious potential for harm in the trial court's informing the jury of its previous ruling is that the jury might conclude that the trial court had admitted the defendant's confession because it believed that it was true.

The question whether reversal is required because of this error depends on the likelihood that it influenced the jury. We have stated that in cases involving constitutional error, the test is whether it is reasonably possible that the jury were misled, and in cases not involving a constitutional error, whether it is reasonably probable that the jury were misled. *State v. Rose,* 169 Conn. 683, 687–88, 363 A.2d 1077 (1975). While it is often difficult to distinguish between these two forms of error, we have generally considered an error to be "constitutional" in nature when it implicates a fundamental constitutional right under decided cases of the United States Supreme Court. See, e.g., *State v. Smith,* 194 Conn. 213, 217, 479 A.2d 814 (1984); *State v. Evans,* 165 Conn. 61, 327 A.2d 576 (1973). The "error" in the present case, however, lies in the very *possibility* that the jury were influenced by the trial court's improper remarks. The defendant has not presented us with any cases which hold that it is specific constitutional error for a trial court to instruct the jury on the outcome of its pretrial hearing on voluntariness, and we have found none. We therefore believe that the test to be applied in this case " ' "is whether the charge considered as a whole presents the case to the jury so that no injustice will result." . . .' *State v. Roy,* 173 Conn. 35, 40, 376 A.2d 391 (1977)." *State v. Stepney,* 191 Conn. 233, 247, 464 A.2d 758 (1983), cert. denied, 465 U.S. 1084, 104 S. Ct. 1455, 79 L. Ed. 2d 722, reh. denied, 466 U.S. 954, 104 S. Ct. 2163, 80 L. Ed. 2d 547 (1984).

Immediately after its improper remarks, the trial court instructed the jury: "My ruling is not to be taken

by you as [giving] to those statements any more weight . . . than you conclude they should have." Elsewhere in the charge the jury were instructed that it was their "province and sole responsibility to pass upon the disputed facts and to ascertain where the truth lies." The jury of course were aware that the primary "disputed fact" at trial was whether or not the defendant had confessed. They could not have believed, as the defendant contends, that they were required to find that his confession was a given fact, entitled merely to more or less "weight." The jury had heard the defendant testify, and had witnessed his lengthy cross-examination, in which he consistently denied that he had spoken the words attributed to him by Cavanaugh and Reid. They also heard the arguments of counsel, where the issue of credibility was sharply focused. The trial court additionally instructed the jury that they were the "sole judges of the facts" and that "it is not part of my duty in any way to decide questions of fact. This is exclusively within your province and . . . you are to decide just what the true facts are."

There is no reason for us to presume that the jury did not follow the trial court's instructions and thus fully understand that disputed issues of fact were solely within their province to decide. Nor do we think it reasonably possible that the jury could have believed that the fact of the confession was not disputed. We conclude that the trial court's remarks, while highly improper, could not ultimately have brought about an injustice in this case.

There is no error.

In this opinion HEALEY, SANTANIELLO and DEAN, Js., concurred.

SHEA, J., concurring. I disagree with the portion of the majority opinion that concludes that the affidavit

presented with the search warrant application was insufficient to support the requisite finding of probable cause. I also disagree with the portion that finds the court's instructions concerning its ruling upon the admissibility of the defendant's confession to have been erroneous.

As the majority opinion recognizes, the search warrant affidavit reasonably supports conclusions that the defendant possessed a Basque .380 handgun, the same kind of weapon used in murdering the victim on February 14, 1980; that he was absent from work on the date the crime occurred; that he was familiar with the location where the victim last was seen; that he had been identified as the person who had kidnapped and sexually assaulted one woman in Fairfield on February 22, 1980, and who had kidnapped, sexually assaulted and attempted to murder another woman on March 20, 1980, in Greenwich; and that he had been convicted for armed robbery in 1974.

Given the deference that should be accorded determinations of probable cause by officials charged with the responsibility of issuing warrants; *United States* v. *Ventresca,* 380 U. S. 102, 109, 85 S. Ct. 741, 13 L. Ed. 2d 684 (1965); 1 LaFave, Search and Seizure § 3.1 (c); the coincidence of these factors in pointing to the defendant's residence as a place where significant evidence might be obtained relating to such a serious crime as that involved here adequately supported a finding of probable cause. Most significant, of course, were the circumstances indicating that the defendant kept at his home a gun of the same model, manufacture and caliber as that used in the murder. Although the majority opinion points to the failure of the affidavit to furnish any information as to whether "the Basque .380 is a particularly rare gun," the judge issuing the warrant was not precluded from relying upon his own general knowledge to conclude that a Basque .380 semi-

automatic is not a household weapon among gun users. When this factor is combined with the actions of the defendant, within slightly more than a month from the date of the crime, in sexually assaulting two other women in the same general area, and his absence from work on the very date the murder occurred, the package adequately supports the finding of probable cause. "[C]ourts should not invalidate the warrant by interpreting the affidavit in a hypertechnical, rather than a commonsense, manner." *United States* v. *Ventresca,* supra.

With respect to the charge concerning the ruling on the admissibility of the defendant's confession, the trial court was attempting to negate the effect of the inference the jury might otherwise have drawn from its awareness that the objection to that evidence had been overruled. The defendant's objection to the evidence had been made in the presence of the jury. The court's instruction, "that this ruling on my part meant no more than the circumstances surrounding the making of those statements were such that you should have them before you for your consideration," was reasonably adapted to overcome the inference the jurors would otherwise have drawn that the court's ruling admitting the confession discredited the defendant's claim of involuntariness in his testimony before them. I disagree with the majority's characterization of this instruction as "highly improper."

I concur with the result.