STATE OF CONNECTICUT *v.* KEVIN USRY
(12799)

PETERS, C. J., HEALEY, GLASS, COVELLO, and HULL, Js.

Argued October 1—decision released November 17, 1987

*Gerard A. Smyth,* assistant public defender, with whom was *Patrick J. Culligan,* assistant public defender, for the appellant (defendant).

*Susan C. Marks,* deputy assistant state's attorney, with whom were *John M. Massameno* and *Herbert E. Carlson, Jr.,* assistant state's attorneys, for the appellee (state).

GLASS, J. The defendant, Kevin Usry, was arrested on October 22, 1982, for murder and was subsequently indicted for capital felony in violation of General Statutes § 53a-54b (7),[1] felony murder in violation of Gen-

---

[1] "[General Statutes] Sec. 53a-54b. CAPITAL FELONY. A person is guilty of a capital felony who is convicted of any of the following . . . (7) murder committed in the course of the commission of sexual assault in the first degree . . . ."

eral Statutes § 53a-54c,[2] and murder in violation of General Statutes § 53a-54a.[3] The defendant was tried by a jury, found guilty on all three counts, and sentenced to three concurrent life terms of imprisonment on May 6, 1985. He now appeals that conviction.

The jury could reasonably have found the following facts. The victim was discovered dead in her New Brit-

[2] "[General Statutes] Sec. 53a-54c. FELONY MURDER. A person is guilty of murder when, acting either alone or with one or more persons, he commits or attempts to commit robbery, burglary, kidnapping, sexual assault in the first degree, sexual assault in the first degree with a firearm, sexual assault in the third degree, sexual assault in the third degree with a firearm, escape in the first degree, or escape in the second degree and, in the course of and in furtherance of such crime or of flight therefrom, he, or another participant, if any, causes the death of a person other than one of the participants, except that in any prosecution under this section, in which the defendant was not the only participant in the underlying crime, it shall be an affirmative defense that the defendant: (A) Did not commit the homicidal act or in any way solicit, request, command, importune, cause or aid the commission thereof; and (B) was not armed with a deadly weapon, or any dangerous instrument; and (C) had no reasonable ground to believe that any other participant was armed with such a weapon or instrument; and (D) had no reasonable ground to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury."

[3] "[General Statutes] Sec. 53a-54a. MURDER DEFINED. AFFIRMATIVE DEFENSES. EVIDENCE OF MENTAL CONDITION. CLASSIFICATION. (a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant [acted] under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime.

"(b) Evidence that the defendant suffered from a mental disease, mental defect or other mental abnormality is admissible, in a prosecution under subsection (a), on the question of whether the defendant acted with intent to cause the death of another person.

"(c) Murder is punishable as a class A felony in accordance with subdivision (2) of section 53a-35a unless it is a capital felony."

ain apartment on the morning of September 8, 1982. She was found naked from the waist down with bloody garments pulled over her head and with a white fluid-like substance around her vaginal area. The police had been notified by a neighbor, Peter Melinoskas, who had become concerned after observing an open window with a metal folding chair placed below it and noticing that the victim's car was parked in the driveway. After yelling through the open window and receiving no response, Melinoskas entered the building through an open basement door, and entered the victim's apartment through the door which was slightly ajar. He found the victim's body and left the house to call the police.

Both the New Britain police department and the state police conducted the investigation. A videotape was taken of the crime scene and both latent and patent fingerprints were found. Some of these prints were identified to be those of the defendant. The cause of the victim's death was determined to be depressed compound skull fractures. A brick was found at the scene which was consistent with the type of instrument that caused the victim's injuries. Forensic testing indicated that sexual intercourse had occurred at a time close to the victim's death, and body fluid tests indicated that intercourse had occurred between a man with type A blood and a woman with either type O or type A blood. The victim's blood type was O, and it was later learned that the defendant's blood type was A. A combing of pubic hair from the victim, a caucasian, revealed the presence of negroid pubic hair. The defendant is black. A warrant was issued for the defendant's arrest and he was arrested on October 22, 1982, and taken into custody. Prior to the defendant's arrest the police learned from New Britain High School officials that he was a special education student. While in custody the defendant made inculpatory statements.

The defendant appeals, claiming that: (1) the trial court erred in failing to suppress the inculpatory statements made to the police; (2) the trial court's instructions pertaining to capital felony were erroneous; and (3) the trial court erred in rendering judgment on the murder conviction after the jury returned guilty verdicts on both the capital felony and felony murder counts of the indictment. We find no error as to the first claim, harmless error as to the second claim, and error as to the third claim.

I

The defendant's first claim is that the trial court erred in denying his motion to suppress statements obtained in violation of his rights under the fourth, fifth and fourteenth amendments to the United States constitution and article first, § 8, of the Connecticut constitution. Specifically, the defendant claims that: (1) his statements were obtained without a proper waiver of the rights afforded him under *Miranda* v. *Arizona,* 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966); (2) the police failed to honor his invocation of his right to remain silent; (3) the statements were involuntary; and (4) the statements were the fruit of an illegal arrest because the arrest warrant was insufficient on its face in that it was not supported by probable cause. We conclude that the trial court did not err in allowing the defendant's incriminating statements to be admitted into evidence at his trial.

The following additional facts are relevant to our consideration of the motion to suppress. The defendant was arrested at his home on October 22, 1982, by members of the New Britain police department. He was advised of his *Miranda* rights inside the house and again in the police car. The defendant indicated at both times that he understood his rights. The defendant was transported to the police station where he was booked,

placed in an interview room and once again advised of his *Miranda* rights. The police officers read the defendant a standard waiver form, handed the form to him to read and asked him if he understood the form. The defendant replied, "I know all that shit," and signed the waiver portion of the form.

The defendant was questioned as to his whereabouts on the night of the murder. He was noncommittal and said that the only information he had was what he read in the newspaper. At some point during this interview, the defendant requested to make a telephone call to his mother and this request was granted. When asked if he wished to make a statement, the defendant replied that "he had nothing to make a statement about." The officers asked the defendant to consider the situation and concluded the interview and exited the room.

The officers reentered the interview room one hour later, and asked the defendant if he wished to use the toilet or have something to eat. The defendant said he did not. The officers also asked whether he remembered his rights, which he said he did, and again the officers read the defendant his *Miranda* rights. After some general questioning, and denial of involvement by the defendant, an officer asked him if he thought the police believed that "the tooth fairy picked him up, flew him around New Britain and placed his hands all over my crime scene." The defendant responded with exculpatory statements. He stated that he was walking on Park Street on the night of the murder, heard a woman scream, went to investigate, climbed a chair to look through a window and saw a man and a woman fighting. The defendant next stated that the man saw him and threw something at him, causing him to fall off the chair and lose consciousness. He then volunteered that "someone must have put my fingerprints on the brick." The defendant had not yet been informed that a brick

had been used in the assault. At this point the defendant agreed to make a statement.

The defendant next indicated that he wished to speak with Robert Smith, who previously had been his public defender. After having been informed by the police that Smith was no longer a public defender, the defendant agreed to make a statement without Smith's presence. The officers again informed the defendant of his rights, read him the waiver form and began the process of taking a formal statement. At the end of the interview the officer who took the statement asked the defendant to read it and asked whether he wanted to make any changes. The defendant responded that the statement was "all right the way it was." When asked to sign a second waiver form and the statement, however, he refused. The defendant stated that he was a special education student and indicated for the first time that he did not understand his constitutional rights and that he had trouble reading.

## A

The defendant's first claim is that the trial court should have suppressed his incriminating statements because the police failed to obtain a knowing and intelligent waiver of his *Miranda* rights. The defendant bases this claim on the following assertions: (1) that although he signed a waiver form prior to the first interview, he was uncooperative and was mentally incompetent to waive those rights knowingly and intelligently; and (2) that the incriminating statement was given in a subsequent interview, without a new waiver having been signed. We are unpersuaded.

"The state has the burden of proving by a preponderance of the evidence that the defendant knowingly and intelligently waived his *Miranda* rights. *State v. Hernandez,* 204 Conn. 377, 395, 528 A.2d 794 (1987); *State v. Chung,* 202 Conn. 39, 48, 519 A.2d 1175 (1987);

*State* v. *Toste,* 198 Conn. 573, 579–80, 504 A.2d 1036 (1986). The waiver must be made voluntarily and 'with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it.' *Moran* v. *Burbine,* 475 U.S. 412, 421, 106 S. Ct. 1135, 89 L. Ed. 2d 410 (1986)." *State* v. *Boscarino,* 204 Conn. 714, 743, 529 A.2d 1260 (1987). " '[T]he question of waiver must be determined on "the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." *Johnson* v. *Zerbst,* 304 U.S. 458, 464 [58 S. Ct. 1019, 82 L. Ed. 1461 (1938)].' *North Carolina* v. *Butler,* [441 U.S. 369, 374–75, 99 S. Ct. 1755, 60 L. Ed. 2d 286 (1979)]." *State* v. *Toste,* supra, 580.

In *Toste,* we set forth factors that may be considered by the court in determining whether an individual had the capacity to understand the *Miranda* warnings, including: "the defendant's experience with the police and familiarity with the warnings; *Fare* v. *Michael C.,* [442 U.S. 707, 726, 99 S. Ct. 2560, 61 L. Ed. 2d 197, reh. denied, 444 U.S. 887, 100 S. Ct. 186, 62 L. Ed. 2d 121 (1979)]; *State* v. *Alfonso,* [195 Conn. 624, 630–31, 490 A.2d 75 (1985)]; *People* v. *Medina,* 71 Ill. 2d 254, 259, 375 N.E.2d 78 (1978); his level of intelligence, including his IQ; *Cooper* v. *Griffin,* 455 F.2d 1142, 1145 (5th Cir. 1972); *State* v. *Benoit,* 440 So. 2d 129, 131 (La. 1983); *Matter of Welfare of S.W.T.,* 277 N.W.2d 507, 512–13 (Minn. 1979); his age; *Fare* v. *Michael C.,* supra; *Matter of D.A.S.,* 391 A.2d 255, 258 (D.C. App. 1978); his level of education; *Davis* v. *North Carolina,* 384 U.S. 737, 742, 86 S. Ct. 1761, 16 L. Ed. 2d 895 (1966); *State* v. *Harris,* 188 Conn. 574, 581, 452 A.2d 634, cert. denied, 460 U.S. 1089, 103 S. Ct. 1785, 76 L. Ed. 2d 354 (1982); his vocabulary and ability to read and write in the language in which the warnings were given; see *State* v. *Alfonso,* supra; *State* v. *Frazier,* [185 Conn. 211, 226, 440 A.2d 916 (1981), cert. denied, 458 U.S.

1112, 102 S. Ct. 3496, 73 L. Ed. 2d 1375 (1982)]; intoxication; see *State* v. *Stankowski,* 184 Conn. 121, 134–35, 439 A.2d 918, cert. denied, 454 U.S. 1052, 102 S. Ct. 596, 70 L. Ed. 2d 588 (1981); his emotional state; *State* v. *Harris,* supra, 582; and the existence of any mental disease, disorder or retardation. *Henry* v. *Dees,* 658 F.2d 406, 411 (5th Cir. 1981); *People* v. *Watson,* 75 Cal. App. 3d 384, 397, 142 Cal. Rptr. 134 (1977)." *State* v. *Toste,* supra, 580–81; see also *State* v. *Hernandez,* supra, 396–97; *State* v. *Chung,* supra, 49–50.

In support of his argument that he was incompetent to waive his *Miranda* rights, the defendant argues that in light of his uncooperativeness with the police after signing the waiver, coupled with his age, and his level of intelligence, the court should have found that he had not knowingly and intelligently waived his rights. The record, however, reveals that the defendant had previously been exposed to the criminal justice system, which indicates that despite his young age and low IQ, he had experience upon which to base his decision to sign the waiver form. The defendant also exercised his constitutional rights by requesting a specific attorney and by requesting permission to make a telephone call, which indicates that he understood his rights and invoked them when he chose to do so. Furthermore, the defendant appeared able to read the waiver form and a written copy of the *Miranda* rights during interrogation and used his finger to follow the words on the page in one instance while reading. A police officer testified that the defendant "aptly read" the documents placed before him. When asked in the first instance what he knew about the homicide, the defendant replied that he only knew "what he had read in the papers." It was only when asked to sign the statement that the defendant claimed he had difficulty reading and that he did not understand his constitutional rights because he was a special education student. Moreover, at all times prior

to his refusal to sign the second waiver form, when asked if he understood his rights the defendant responded that he did. At one point he even responded, "yeah, I know all that shit."

Finally, the fact that the defendant refused to sign the statement or a second waiver form does not render his statement inadmissible. We have recently stated that "[w]hile the refusal to sign a written waiver or written statement is a 'relevant factor in determining whether an individual knowingly, intelligently, and voluntarily waived his privilege'; *State* v. *Derrico,* [181 Conn. 151, 165, 434 A.2d 356, cert. denied, 449 U.S. 1064, 101 S. Ct. 789, 66 L. Ed. 2d 607 (1980)]; it is not controlling and 'may be outweighed by affirmative conduct indicative of a knowingly and intelligently made decision not to remain silent.' *State* v. *Harris,* supra, 581." *State* v. *Shifflett,* 199 Conn. 718, 733, 508 A.2d 748 (1986). The defendant offered statements indicating that he understood his rights and expressly agreed to make an oral, although not written statement. This constitutes "affirmative conduct" evidencing waiver, which we find persuasive despite the defendant's refusal to sign the waiver form.

The defendant next claims that the written waiver is inapplicable to the statements made by him because the waiver applies only to statements made in the first interview. The defendant, relying on *State* v. *Williams,* 190 Conn. 104, 459 A.2d 510 (1983), argues that the ninety minute break in interrogation requires the signing of a new waiver. In *Williams* the defendant did not expressly waive his rights, but refused to answer questions, and eventually made inculpatory statements after continued police interrogation. In the present case, however, the defendant signed a written waiver form and orally agreed to make a statement. The ninety minute break in questioning does not invalidate the waiver, and fresh warnings were given to the defendant

although they were not necessary. See 1 W. Lafave & J. Israel, Criminal Procedure (1984) § 6.8 (b). Thus, we conclude that the trial court did not err in its finding that the defendant effectively waived his *Miranda* rights.

B

The defendant's second claim is that the trial court should have suppressed his incriminating statements because the police violated his *Miranda* rights by continuing to question him after he had invoked his right to remain silent. The defendant bases this claim on the fact that during the interview, when asked if he wished to make a statement, the defendant stated that he "had nothing to make a statement about." As the defendant notes, the "pivotal question" is whether he invoked his right to remain silent with these words, or at any other time prior to making the inculpatory statements. If he did not invoke the right to remain silent, we do not reach the issue of whether the defendant's right to cut off questioning was "scrupulously honored," as required by *Michigan* v. *Mosley,* 423 U.S. 96, 104, 96 S. Ct. 321, 46 L. Ed. 2d 313 (1975). After reviewing the circumstances leading to the defendant's statement, we find that he did not invoke the right to remain silent.

Review of the record indicates that the defendant understood his constitutional rights and clearly invoked them when he chose to do so. His remark that he "had nothing to make a statement about" was in response to the police inquiry whether he wanted to make a statement and was consistent with his stance that he was uninvolved in the crime. The statement simply does not rise to the level of an invocation of the right to remain silent. The defendant did not indicate that he was opposed to speaking with the police, and we decline to construe his statement to mean this. Rather, his statement was one in a series of exculpatory statements

proffered by the defendant to clear himself from suspicion. One court has recently noted that where the "petitioner made no reference whatsoever to the Fifth Amendment, but maintained steadfastly that he simply had no information to give police authorities . . . [t]his conduct . . . cannot rationally be construed as an invocation of his Fifth Amendment privilege." *Damiano* v. *Gaughan,* 592 F. Sup. 1222, 1226 (D. Mass. 1984); *State* v. *Pacheco,* 481 A.2d 1009, 1015 (R.I. 1984). The facts here resemble a situation where a defendant "expresses an unwillingness or inability to respond to a particular inquiry (e.g., 'you've done asked me a question I can't answer') [which] is not a general claim of the privilege." 1 W. Lafave & J. Israel, supra, § 6.9 (e), citing *Taylor* v. *Riddle,* 563 F.2d 133 (4th Cir. 1977), cert. denied, 434 U.S. 1020, 98 S. Ct. 744, 54 L. Ed. 2d 768 (1978).

## C

The defendant's third claim is that his incriminating statements were involuntary. In support of this claim, he argues that given his young age and limited intelligence, his will was overborne by the police when they confronted him with the fingerprint evidence. We are unpersuaded.

"The use of an involuntary confession in a criminal trial violates due process of law. *State* v. *Smith,* 200 Conn. 465, 475, 512 A.2d 189 (1986); *State* v. *Shifflett,* [supra]. The trial court must determine the voluntariness of a confession based on the totality of the circumstances. *State* v. *Smith,* supra, 477; *State* v. *DeAngelis,* 200 Conn. 224, 235, 511 A.2d 310 (1986); *State* v. *Falby,* 187 Conn. 6, 16, 444 A.2d 213 (1982). In this determination, the central criterion is whether police conduct 'was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined . . . .' *Rodgers* v. *Richmond,* 365 U.S. 534, 544, 81

S. Ct. 735, 5 L. Ed. 2d 760 (1961); *State* v. *Smith,* supra; *State* v. *Shifflett,* supra." *State* v. *Boscarino,* supra, 740.

Review of the record reveals no evidence indicating that the defendant's will was overborne. The defendant was eighteen years old and had previously been exposed to the criminal justice system. Moreover, the defendant was repeatedly advised of his rights prior to making the incriminating statement and was asked if he understood them. Although a special education student and of "dull normal" intelligence, the defendant indicated through his conduct that he could comprehend the meaning of the *Miranda* warnings. As discussed above, he exercised his rights when he chose to do so. Nothing in the record indicates that his intellectual deficiency stripped him of his free will. Nor did the police conduct affect the voluntariness of his statements. The police did not coerce or trick the defendant when they confronted him with the fingerprint evidence. Rather, the police accurately informed the defendant of the information they possessed, and he chose to make a statement. See *Williams* v. *Ohio,* 547 F.2d 40 (6th Cir. 1976); *Turner* v. *State,* 76 Wis. 2d 1, 250 N.W.2d 706 (1977). Finally, as indicated in the record, the defendant's physical needs were provided for, he had an opportunity to telephone his mother and he did not appear to be under the influence of alcohol or narcotics.

### D

The defendant's final claim on the suppression issue is that his incriminating statements were the fruit of an illegal arrest because the warrant for his arrest lacked probable cause. We agree with the trial court's finding that the arrest warrant was supported by an affidavit sufficient to establish probable cause for the defendant's arrest and therefore conclude that the trial court did not err in denying his motion to suppress.

"The validity of an arrest warrant depends upon whether the application for the warrant and the accompanying affidavit establish probable cause to believe that: (1) a crime has been committed; and (2) the person to be arrested committed that crime. General Statutes § 54-2a (a) (1); Practice Book § 593; *State* v. *Daley,* 189 Conn. 717, 720, 458 A.2d 1147 (1983); *State* v. *DeChamplain,* 179 Conn. 522, 529, 427 A.2d 1338 (1980); 1 LaFave, Search and Seizure (1978) § 3.7. The affidavit must recite sufficient facts so that the judicial officer who issues the warrant can, relying solely on the information thus brought to his or her attention, make an independent determination that probable cause exists as to each element of every crime charged. U.S. Const., amends. IV and XIV; Conn. Const., art. I, § 7; *Illinois* v. *Gates,* 462 U.S. 213, 238–39, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983); *Whiteley* v. *Warden,* 401 U.S. 560, 565 n.8, 91 S. Ct. 1031, 28 L. Ed. 2d 306 (1971); *State* v. *Bember,* 183 Conn. 394, 409–10, 439 A.2d 387 (1981); *State* v. *Jackson,* 162 Conn. 440, 443, 294 A.2d 517, cert. denied, 409 U.S. 870, 93 S. Ct. 198, 34 L. Ed. 2d 121 (1972)." *State* v. *Heinz,* 193 Conn. 612, 616–17, 480 A.2d 452 (1984). We note that deference is to be given to the decision of the magistrate who issued the warrant. The role of this court is to decide "whether the evidence viewed as a whole provided a 'substantial basis' for the Magistrate's finding of probable cause . . . ." *Massachusetts* v. *Upton,* 466 U.S. 727, 732–33, 104 S. Ct. 2085, 80 L. Ed. 2d 721 (1984); *State* v. *Heinz,* supra, 618.

The affidavit before the issuing judge set forth the following facts: (1) on the morning of September 8, 1982, the body of the victim, a white female, was found naked from the waist down on the bedroom floor of her first floor apartment, with fluid-type substance present around her vaginal area; (2) a metal folding chair was

found on that morning, at the base of the victim's kitchen window, where entry appeared to have been made; (3) the defendant's fingerprint was found on the chair by the police; (4) a tenant in the second floor apartment arrived home at approximately 9 p.m. on September 7, walked directly past the victim's kitchen window to reach the door and did not observe the metal folding chair at that time; (5) the tenant heard commotion from the victim's apartment at approximately 11:30 p.m.; (6) the victim's husband stated that to the best of his knowledge no black males had visited their apartment during the past five years; (7) negroid pubic hairs were present in combings from the victim's pubic hair; and (8) the defendant is a black male. There is no dispute that the facts recited in the affidavit in support of the arrest warrant show probable cause that a crime has been committed. Also, when the recited facts are considered collectively with the positive fingerprint identification of the defendant these facts combine to constitute probable cause to believe that the defendant committed the crime. Even though the recited facts may not be sufficient to establish beyond a reasonable doubt that the defendant was guilty of the crimes charged, we agree that they establish a substantial basis for the magistrate's finding of probable cause for the defendant's arrest.

## II

The defendant's next claim is that the trial court's instructions pertaining to capital felony were erroneous.[4] Specifically he claims that: (1) the instructions

---

[4] The capital felony jury instructions are as follows:

"Now, as to the first count, which is entitled 'Capital Felony Murder,' the gist of the statute reads as follows: 'A person is guilty of capital felony who commits murder in the course of the commission of sexual assault in the first degree.'

"There are basically two elements: first, that the defendant committed murder, and, secondly, it was done in the course of sexual assault in the first degree.

regarding the meaning of "in the course of the commission of sexual assault in the first degree" enlarged the crime beyond its statutory elements, thereby depriving the defendant of due process of law; and (2) the instructions regarding the legal consequence of sexual intercourse with a dead body were incorrect as a matter of law. We find harmless error as to the first claim and no error as to the second claim.

"Now, as to the first element, if you did not find or do not find that the defendant was guilty of murder, as I have instructed you, as to the third count, you need go no further with this count, and you must find the defendant not guilty of capital felony murder; and this even goes if you found the defendant guilty of a lesser included charge of murder. And the only way you continue with this charge is if you find the defendant guilty of murder as to the third count.

"If you find him guilty as to a lesser included charge of manslaughter, it does not fulfill the first element, and you need go no further with this count.

"If, on the other hand, you find the defendant guilty of murder, you must consider the second count. As to the second count, sexual assault in the first degree is set out in the statute as follows: 'A person is guilty of sexual assault in the first degree when such person compels another person to engage in sexual intercourse by the use of force against such other person.'

"Now, actually, when you consider that statute, you can break it down into the two elements or parts: first, that there must be sexual intercourse by the defendant with the victim, and it must have been compelled by the use of force.

"Now, the statute does define a person, for the purposes of this statute, as a human being. And as to the first part of sexual assault in the first degree, sexual intercourse includes its ordinary meaning, which is the penetration of the female vagina by the male penis. Any penetration, no matter how slight, is sufficient under the statute, and there is no need for the emission of semen from the male organ. This statute only applies where the defendant and the victim are not married to one another.

"Now, as to that part of it, you have had testimony of both [the victim's husband] and Miss Alfonsi, that the apartment was occupied by [the victim's husband] and his wife, the decedent.

"In this connection, the touching of the private parts would not be sufficient, such as the touching of the breast or the pubic area, because the element of the statute is sexual intercourse.

"As to the second element, it must have been compelled by the use of force.

"Now, 'use of force' is defined in the statute as the use of a dangerous instrument or the use of actual physical force or violence or superior strength against the victim.

## A

The defendant maintains that the trial court's instructions regarding the meaning of "in the course of the commission of sexual assault in the first degree" were erroneous because they enlarged the crime of capital felony by allowing an attempted sexual assault to constitute one of the predicate offenses. "In reviewing the trial court's charge to the jury we must review the instructions as a whole, including any supplemental instructions. *State* v. *Reed,* 174 Conn. 287, 308, 386

"And 'dangerous instrument' is defined as any instrument, article or substance which, under the circumstances in which it is used or attempted to be used, is capable of causing death or serious physical injury.

"Now, the Court will instruct you that if the instrument used to cause the injury, which Dr. Shah testified caused the death, was the brick, then it was a dangerous instrument, if you credit her opinion that its use in each of the blows to the head of [the victim] could have caused unconsciousness or death.

"Now, there would not be force used to compel if the penetration or intercourse was made on an unconscious or helpless body or a dead body. So, if the intercourse, if there was intercourse that you found, or penetration of the vagina, and you found that it was done after the fact, in other words, where the defendant or the person coming upon the helpless body or dead body, it does not fall within sexual assault in the first degree because the sexual intercourse must have been compelled by force.

"Now, in this connection, however, if the person who is having the sexual intercourse or penetration has compelled it by force, even though the person has become unconscious or dead, then it is sexual assault in the first degree.

"Now, the phrase 'in the course of the commission' is a time limitation and means conduct occurring in an attempt to commit, during the commission or in the immediate flight after the attempt or the commission of the offense. The immediate killing of said person so as to eliminate a witness to the crime or to avoid detention is also 'in the course of commission.'

"In this connection, an assault to overcome her resistance to sexual assault, without the intention to cause her death, is not enough, or if the offender caused her death prior to having an intent to sexually assault her, would not be sufficient. The intent to cause her death must occur some time during the attempt or commission of the crime of sexual assault in the first degree.

"It is not necessary, however, that the sexual intercourse be completed. It is sufficient if some act, such as the use of force, is done and the sur-

A.2d 243 (1978); *Maciejewska* v. *Lombard Bros., Inc.,* 171 Conn. 35, 40, 368 A.2d 206 (1976); *State* v. *Edwards,* 163 Conn. 527, 537, 316 A.2d 387 (1972). '[I]ndividual instructions are not to be judged in artificial isolation from the overall charge. *State* v. *Holmquist,* 173 Conn. 140, 151, 376 A.2d 1111, cert. denied, 434 U.S. 906, 98 S. Ct. 306, 54 L. Ed. 2d 193 (1977); *Mazzucco* v. *Krall Coal & Oil Co.,* 172 Conn. 355, 357, 374 A.2d 1047 (1977).' *Cohen* v. *Cohen,* 182 Conn. 193, 199, 438 A.2d 55 (1980)." *State* v. *Braswell,* 194 Conn. 297, 311, 481 A.2d 413 (1984), cert. denied, 469 U.S. 1112, 105 S. Ct. 793, 83 L. Ed. 2d 786 (1985). Examining the jury charge in its entirety, we find harmless error.

In its instruction, the trial court made a number of references to the temporal relationship required by the capital felony statute between the two predicate offenses, murder and sexual assault in the first degree. In so doing, the trial judge used the word "attempt" to explain that the phrase "in the course of the commission of" means before, during or after the completion of the sexual assault. This use of "attempt" was in error, however, because a possible interpretation of the charge is that the underlying sexual assault need not be completed. The trial judge also stated "[i]t is not necessary, however, that the sexual intercourse be completed." It appears that the trial court intended this

rounding circumstances proved beyond a reasonable doubt that the force was used with the intent to have sexual intercourse with [the victim].

"Under such circumstances, it then would not be of a consequence if the sexual intercourse was engaged in while she was unconscious or dead.

"So, if you find beyond a reasonable doubt that the State has proved each of the following elements, first, that the defendant committed the murder of [the victim], and, second, it was done in the course of sexual assault in the first degree, then you must find him guilty of capital felony murder, the first count.

"On the other hand, if you find that the State has failed to prove either one of these elements to you beyond a reasonable doubt, you must find him not guilty as to the first count."

phrase to indicate that it did not matter whether the sexual assault was completed before the murder, so long as there was an intent, prior to killing, to sexually assault the victim. Nonetheless, we find error because an essential element of the crime of sexual assault in the first degree is penetration.

We find these errors harmless. The complained of phrases, standing alone, could be interpreted as allowing an attempted sexual assault to constitute a predicate offense of capital felony. These phrases, however, must be considered with respect to the charge as a whole. "A phrase having a different meaning when culled from the charge will not be regarded as error when there is no 'reasonable possibility' that the jury were misled." *State* v. *Annunziato,* 169 Conn. 517, 532, 363 A.2d 1011 (1975); *Magnon* v. *Glickman,* 185 Conn. 234, 247, 440 A.2d 909 (1981). After reviewing the entire charge, we are convinced that the jury was adequately instructed on the elements of capital felony. Although the trial court's use of the questioned language was erroneous, the trial court clearly explained the requisite elements of capital felony on two separate occasions. Furthermore, the trial court read the capital felony statute to the jury three times. Finally, even if the jurors misperceived the instructions and believed that attempted sexual assault could constitute a predicate offense for capital felony, any such misperception could not have affected their verdict. There was no factual dispute as to whether sexual intercourse occurred, and the defendant did not suggest penetration had not occurred. We conclude that there is no reasonable possibility that the trial court's misstatements misled the jury. " 'Jury instuctions are calculated to give the jurors a clear understanding of the elements of the crime charged, and to afford them proper guidance for their determination of whether those elements were present.' *State* v. *Sinclair,* [197 Conn. 574, 581,

500 A.2d 539 (1985)]; *State* v. *Smith,* 194 Conn. 213, 219, 479 A.2d 814 (1984)." *State* v. *Fleming,* 198 Conn. 255, 270, 502 A.2d 886, cert. denied, 475 U.S. 1143, 106 S. Ct. 1797, 90 L. Ed. 2d 342 (1986). We conclude that the jury charge fulfilled this purpose.

B

The defendant also claims that the jury instructions pertaining to the legal consequences of sexual intercourse with a dead body were erroneous. He argues that the trial court should have instructed the jury that if the victim was dead before sexual intercourse occurred, he could not be found guilty of sexual assault in the first degree. We disagree.

In *State* v. *Rodgers,* 198 Conn. 53, 502 A.2d 360 (1985), we held that one who renders his victim unconscious and then commits a sexual assault on that person can be found guilty of sexual assault in the first degree. In that case, the defendant argued that because the victim was unconscious when the sexual assault occurred, he could not be found to have "compelled" the victim to engage in sexual intercourse. We stated that it would be "bizarre . . . to impose a lesser degree of responsibility for sexual assault upon a person, who, by his own hand, renders the victim physically helpless . . . ." Id., 61.

Today we apply the logic of *Rodgers* to the present case. It would be strange indeed if the penalty under our law would be less severe if the defendant sexually assaulted the victim and in so doing caused her death than it would be if he sexually assaulted the victim and did not cause her death. That would be the same bizarre result we noted in *Rodgers,* and would encourage assailants to kill their victims when committing a sexual assault. Sexual assault in the fourth degree occurs when an assailant commits a sexual assault on a dead body, but the assailant is not involved in causing the victim's

death. When, however, the assailant kills the victim in order to commit a sexual assault, he has committed sexual assault in the first degree. The trial judge properly instructed the jury on this issue.

### III

The defendant's final claim is that the trial court erred in denying the defendant's motion for judgment of acquittal on the third count of the indictment, the murder charge, because murder is a lesser included offense of the capital felony charge. The state concedes that murder is a lesser included offense of capital felony under these circumstances, but opposes the defendant's claim that the motion for acquittal on that charge should have been granted. The state argues that the trial court erred when it rendered judgment for both the greater offense and the lesser included offense, after guilty verdicts on both counts were returned by the jury. We agree. The trial court erred when it rendered a judgment on the murder charge and that judgment should be set aside. There is no basis to support a motion for acquittal on this charge as the defendant was found guilty of murder by the jury, although he may not be punished for both that crime and for capital felony. See *Ball* v. *United States,* 470 U.S. 856, 865, 105 S. Ct. 1668, 84 L. Ed. 2d 740 (1985).

There is error in part, the judgment of conviction with regard to the third count of the indictment is set aside and the case is remanded to the trial court with direction to render judgment as on file except as modified in accordance with this opinion.

In this opinion the other justices concurred.