STATE OF CONNECTICUT *v.* STEVEN J. WOOD
(12734)

PETERS, C. J., HEALEY, CALLAHAN, GLASS and COVELLO, Js.

Argued March 8—decision released June 28, 1988

*Jon C. Blue,* assistant public defender, with whom, on the brief, were *Joseph M. Shortall,* chief public defender, *Joette Katz,* public defender, and *Gerard*

*Smyth* and *Maria T. Madsen,* assistant public defenders, for the appellant (defendant).

*Susan E. Gill,* assistant state's attorney, with whom were *Herbert G. Appleton,* assistant state's attorney, and, on the brief, *Jack Fischer, Janine D'Angelo, Brett DeLallo* and *Eileen McCarthy Geel,* law student interns, for the appellee (state).

COVELLO, J. The defendant, Steven J. Wood, was convicted by a jury of three counts of murder in violation of General Statutes § 53a-54a[1] and of one count of capital felony in violation of General Statutes § 53a-54b (8).[2] The jury also found the defendant guilty but not criminally responsible of a fourth count of murder pursuant to General Statutes (Rev. to 1983) § 53a-13.[3] After the penalty phase of the proceedings,

[1] "[General Statutes] Sec. 53a-54a. MURDER DEFINED. AFFIRMATIVE DEFENSES. EVIDENCE OF MENTAL CONDITION. CLASSIFICATION. (a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant [acted] under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime.

"(b) Evidence that the defendant suffered from a mental disease, mental defect or other mental abnormality is admissible, in a prosecution under subsection (a), on the question of whether the defendant acted with intent to cause the death of another person.

"(c) Murder is punishable as a class A felony in accordance with subdivision (2) of section 53a-35a unless it is a capital felony."

[2] General Statutes § 53a-54b (8) provides in relevant part: "A person is guilty of a capital felony who is convicted of any of the following . . . (8) murder of two or more persons at the same time or in the course of a single transaction."

[3] General Statutes (Rev. to 1983) § 53a-13 provides in relevant part: "In any prosecution for an offense, a defendant may be found guilty but not criminally responsible if, at the time of the proscribed conduct, he lacked

the jury found a mitigating factor, thereby eliminating the death penalty as a possible sentence. General Statutes (Rev. to 1983) § 53a-46a (f). On November 16, 1984, the court, *Hammer, J.,* committed the defendant to the custody of the commissioner of correction for a total effective sentence of 120 years.[4]

The jury could reasonably have found that on the evening of April 16, 1982, the defendant shot and killed his former wife, Rosa Wood, and her boyfriend, George Troie, on Farmington Avenue in West Hartford. The defendant then proceeded to the home on White Pine Lane he had shared with his former wife. Once there, he shot and killed his former mother-in-law, Patricia Voli. The defendant then shot and killed his fifteen year old daughter, Elisa Wood.

At trial, the defendant did not deny that he had caused the deaths, but asserted the alternative defenses of extreme emotional disturbance; General Statutes § 53a-54a (a); or lack of substantial capacity, due to a mental disease or defect, to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law. General Statutes (Rev. to 1983) § 53a-13. After the rendering of judgment on his convictions, the defendant appealed to this court.

I

The defendant first claims that the trial court erred in denying his request to suspend the proceedings and

substantial capacity as a result of mental disease or defect either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law."

[4] On November 16, 1984, the trial court committed the defendant to the custody of the commissioner of correction for a term of sixty years each on the second, third and fourth counts of the May 26, 1982 indictment for the murders of George Troie, Patricia Voli and Elisa Wood, and for a term of sixty years on the fourth count of the December 9, 1982 indictment for capital felony. The defendant was ordered to serve the three sixty year sentences on the May 26, 1982 indictment concurrently to each other and consecutive to the sixty year sentence imposed on the December 9, 1982 indictment, for a total effective sentence of 120 years.

direct the jury to read certain documentary evidence. The defendant had introduced as exhibits, for the purpose of establishing his state of mind, a journal and various unsent letters to his former wife written by him during the months prior to the homicides. The defendant had also introduced records of juvenile court proceedings and associated reports of child welfare agencies compiled during his troubled childhood.[5] The court admitted the journal and letters for the limited purpose of demonstrating the defendant's mental or emotional state during the time leading up to the homicides, while the juvenile court records were admitted for the purpose of showing the basis of expert opinion offered in testimony.

The defendant requested that the court suspend the proceedings to enable the jury to read these exhibits, and had prepared sixteen copies of the documents to facilitate this being done. As to the journal and letters, the state joined in the defendant's request. The court refused to suspend the proceedings, but did express willingness to consider proposed jury instructions concerning the reading of this evidence.

Later, the defendant requested that the court explicitly instruct the jury that they were required to read the journal, the letters and the juvenile records before beginning deliberations. In making this request, the defendant reiterated his position that "the proper time for the reading of these exhibits by the jury was at the time of their introduction as evidence . . . ." The court declined to order the jurors to read the documents before deliberating. Instead, as part of its general charge, the court instructed the jury to give careful

---

[5] The records compiled during the defendant's youth include: (1) a family history submitted by a juvenile court investigator in 1949; (2) results of psychological and psychiatric tests; (3) supplementary information concerning the defendant's psychological development; and (4) the 1952 psychological examination results.

consideration to *all* the evidence presented during the trial—testimony, stipulations and exhibits. In its instructions to the jury, at the close of the trial, the court noted the voluminous nature of the documentary evidence that had been introduced. The court explained that the letters and journal entries had been copied so that there would be one packet of these materials per juror, in order to make efficient use of the jury's time. The jury was cautioned not to attach any particular significance to the fact that these exhibits had been copied in order to provide each juror with his or her own set of materials, while other documentary evidence had not been copied in this manner.[6] The defendant objected to the charge as given.

## A

The defendant first claims that the trial court erred in refusing to direct the jury to read these documentary exhibits (1) prior to the conclusion of the experts' testimony or (2) prior to the commencement of deliberations. As to the requested order to have the exhibits read during the course of the experts' testimony, we note that "[t]he conduct of the trial must necessarily be left largely to the discretion of the presiding judge, a discretion which in its very nature cannot be made the subject of review by this court, except in a clear case of the abuse of that discretion." *McKiernan* v. *Lehmaier,* 85 Conn. 111, 119, 81 A. 969 (1911). "This court reviews the action of the trial court only as to whether that action cannot be supported in reason." *DiPalma* v. *Wiesen,* 163 Conn. 293, 299, 303 A.2d 709 (1972).

---

[6] The jury instructions were in relevant part: "I would instruct you very specifically that the fact that these exhibits have been copied, does not mean that you are to attach any greater significance to them than you would to any other exhibits which will be before you in the jury room. Because of their length, they have been copied for your convenience, and in order to expedite your consideration of these exhibits, and you are not to attach any particular significance to the fact that these appear to be the only documents which have been copied in this manner."

The record reveals ample support for the trial court's action. This very lengthy trial featured extensive testimony and documentary evidence much of which expressly and in detail discussed the contents of the exhibits. In the court's estimation, it would consume a half day for the jury to read the defendant's unsent letters to his former wife, letters that ranged from three to ten pages each, and the reports of various state agencies regarding the defendant's family history. It was within the court's discretion to have the trial continue without this significant interruption. Reasonable efforts in the conduct of a trial aimed at making efficient use of time are within the sound discretion of the court. *Elliott* v. *New York, N.H. & H. R. Co.,* 83 Conn. 320, 329, 76 A. 298 (1910).

Further, the court was mindful of the risk that reading the exhibits prior to the conclusion of the experts' testimony might prompt juror conversations about the exhibits' content.[7] Such conversations, taking place before all the evidence was presented and without the benefit of the court's instructions on the law, would jeopardize the defendant's right to a fair trial. *State* v. *Castonguay,* 194 Conn. 416, 433, 481 A.2d 56 (1984); *State* v. *Washington,* 182 Conn. 419, 424–27, 438 A.2d 1144 (1980). The trial court, in the exercise of prudence and caution, sought to minimize the risk of improper and premature juror discussions of the material contained in these exhibits. " 'The action of the trial court is not to be disturbed unless it abused its legal discretion. . . . In determining whether there has been an abuse of discretion, the ultimate issue is whether the court could reasonably conclude as it did.' " *DiPalma*

---

[7] The trial court stated: "I have read those letters, and I have read those records, and if I were a member of this panel, it would be virtually impossible for me not to discuss it with my fellows. There have been two cases that have been reversed upon the basis of deliberations, by members of the jury amongst themselves . . . it's an open invitation for them to discuss. . . . The request is denied."

v. *Wiesen,* supra, 298–99. Given the testimony summarizing the documents, time constraints and the significant risk of premature discussion on the issues involved, we conclude that the trial court's decision that the jury should not have been required to read the defendant's letters and journal entries prior to the conclusion of the experts' testimony was a legitimate exercise of its discretion.

B

As to the defendant's request that the jury be instructed to read the exhibits in their entirety before commencing deliberations, we conclude that the trial court's decision on this matter was similarly within its sound discretion. Although the trial court did not expressly order the jury to read the full text of each and every exhibit, the court did instruct the jury to give careful consideration to *all* the evidence in the case. As part of its general remarks at the beginning of trial and again at its conclusion, the court advised the jurors to examine carefully each piece of evidence and to consider all the evidence presented, whether by means of testimony, stipulation or exhibits. The court cautioned the jury, however, not to attach undue weight to those exhibits that had been reproduced simply on the basis of their having been copied and distributed. While the instructions did not conform exactly to the proposed instructions requested by the defendant, "[i]nstructions to the jury need not be in the precise language of a request." *State* v. *Bunkley,* 202 Conn. 629, 658, 572 A.2d 795 (1987). We conclude that the instructions as given were adequate "to give the jury 'a clear understanding of the elements of the crime charged and the proper guidance' " to enable them to consider the evidence and reach a supportable verdict. Id., quoting *State* v. *Avila,* 166 Conn. 569, 574, 353 A.2d 776 (1974).

" 'Moreover, in reviewing jury instructions our task is also to view the charge itself as part of the whole trial.' " *State* v. *Kurvin,* 186 Conn. 555, 563, 442 A.2d 1327 (1982), quoting *United States* v. *Park,* 421 U.S. 658, 674, 95 S. Ct. 1903, 44 L. Ed. 2d 489 (1975); *State* v. *Silano,* 204 Conn. 769, 773, 529 A.2d 1283 (1987). In the context of a lengthy trial replete with massive documentary evidence, we conclude that the charge as given substantially complied with the defendant's request without misleading the jury into giving misguided and inappropriate deference to the documentary evidence introduced. See *State* v. *Kurvin,* supra, 561 (jury charge is tested by whether it conveyed the substance of the request).

## II

The defendant next claims that the trial court erred in admitting the testimony of John Felber, a psychiatrist who had treated the defendant's former wife, Rosa Wood, for anxiety and depression over a period of time from 1979 through 1981. The defendant's claim of extreme emotional disturbance centered principally on his relationship with his former wife and the mental and emotional turmoil that grew out of the breakdown of that relationship. The marital discord and ultimate dissolution stemmed, in large part, from Rosa Wood's belief that the defendant had been sexually molesting their fifteen year old daughter. The defendant maintained at trial that he had made only one sexual advance toward their daughter, which had been rebuffed. Felber testified for the state to rebut the defendant's testimony that he had not engaged in repeated attempts to molest his daughter sexually.

The defendant objected to the admission of this testimony on hearsay and relevancy grounds. The court found that the state of the marriage and the effect on the defendant of its breakdown were significant ele-

ments of his affirmative defense of extreme emotional disturbance. The court found Felber's testimony to be an aid to the jury's assessment of the state of the marriage and the effect of the marital breakdown on the defendant's emotional and mental stability. The court concluded, therefore, that the testimony was relevant. We agree.

As to the defendant's hearsay objection, the court found that Felber's testimony consisted of statements made to him by Rosa Wood for the purpose of diagnosis and treatment and thus were admissible pursuant to the hearsay exception for statements made to a treating physician. Again, we agree.

"A physician, who is consulted by a patient for the purpose of obtaining from her [or him] professional medical treatment or advice incidental thereto, may testify to her [or his] opinion even though it is based, in whole or in part, on statements made . . . by the patient; and, of course, she [or he] *may also testify to such statements. Brown* v. *Blauvelt,* 152 Conn. 272, 274, 205 A.2d 773 (1964)." (Emphasis added.) *State* v. *Esposito,* 192 Conn. 166, 175, 471 A.2d 949 (1984), modified, *State* v. *Pierson,* 201 Conn. 211, 514 A.2d 724 (1986). Felber could, therefore, properly testify as to those complaints of Rosa Wood that formed part of her medical history. Id. In this case, the mental and emotional stress that prompted her to seek psychiatric care stemmed from her belief that the defendant had been making sexual advances toward their daughter. Since Rosa Wood's statements to Felber relating to those circumstances were made for the purpose of diagnosis and treatment, they were admissible as evidence. See *State* v. *Esposito,* supra; *Brown* v. *Blauvelt,* supra; C. Tait & J. LaPlante, Handbook of Connecticut Evidence (2d Ed.) § 11.12.3.

The defendant's final challenge to the admissibility of Felber's testimony was an objection based on the constitutional right of confrontation. The defendant contends that, since Rosa Wood's death prevented him from cross-examining her as the maker of the underlying statements that formed the basis of Felber's testimony, he was denied his constitutional right to confront his accusers.[8] We are unpersuaded that this hearsay exception offends the confrontation clauses of the federal and state constitutions as this claim is essentially evidentiary and not constitutional. *State* v. *Veal,* 201 Conn. 368, 375–76, 517 A.2d 615 (1986).

In resolving confrontation clause claims, the court must determine that the testimony from the absent witness is sufficiently reliable. Once reliability is established, the admission of the testimony no longer offends constitutional confrontation precepts. *Bourjaily* v. *United States,* 483 U.S. 171, 182–83, 107 S. Ct. 2775, 97 L. Ed. 2d 144 (1987). In *Bourjaily,* the United States Supreme Court held that when the out-of-court statement " 'falls within a firmly rooted hearsay exception,' " the court need not conduct the customary independent inquiry regarding the indicia of reliability surrounding the statement before deciding its admissibility on constitutional grounds. Id., quoting *Ohio* v. *Roberts,* 448 U.S. 56, 66, 100 S. Ct. 2531, 65 L. Ed. 2d 597 (1980). In *Bourjaily,* the challenged statement was admissible pursuant to the "statements of a co-conspirator" exception to the hearsay rule, while the statement at issue in this appeal falls within the "statements to a treating physician" exception. We conclude that, similar to the co-conspirator exception,

---

[8] The defendant claims this right under the sixth amendment to the United States constitution and article first, § 8, of the Connecticut constitution, which provide, respectively: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . ."; and "In all criminal prosecutions, the accused shall have a right . . . to be confronted by the witnesses against him. . . . "

the exception for statements made to a treating physician "is firmly enough rooted in our jurisprudence that, under [the United States Supreme] Court's holding in *Roberts*, a court need not independently inquire into the reliability of such statements" in order to satisfy constitutional safeguards. *Bourjaily* v. *United States,* supra, 183. Once the trial court was satisfied that Rosa Wood's statements to Felber had been made in furtherance of her diagnosis and treatment, and thus fell within the treating physician exception, further independent inquiry into the reliability of the statements was not required by the confrontation clauses of the state or federal constitutions, the state and federal constitutional standards were satisfied, and the testimony was therefore admissible. Id.; *State* v. *Veal,* supra.

## III

The defendant next claims that the court erred in refusing to allow him to present certain surrebuttal evidence and in refusing to deliver a *Secondino*[9] charge to the jury. The defendant had requested the court to suspend the trial in order to permit him to depose Wayne Owen, a clinical psychologist who had performed psychological tests on the defendant at the request of John Donnelly, a psychiatrist who was the state's only expert witness on the issue of the defendant's mental condition. Owen had recently suffered a stroke and was unable to testify in person. The transcript of his contemplated deposition was to serve as surrebuttal evidence. The defendant's request to present surrebuttal evidence was prompted by the rebuttal testimony of Donnelly. The court denied the request.

---

[9] *Secondino* v. *New Haven Gas Co.,* 147 Conn. 672, 165 A.2d 598 (1960), instructs that " '[t]he failure of a party to produce a witness who is within his power to produce and who would naturally have been produced by him, permits the inference that the evidence of the witness would be unfavorable to the party's cause.' " Id., 675, quoting *Ezzo* v. *Geremiah,* 107 Conn. 670, 677, 142 A. 461 (1928).

## A

The defendant offered the opinions of two psychiatrists and a psychologist regarding the issue of his mental condition. Walter Borden, a psychiatrist, testified that in his opinion the defendant presented a "severe mixed personality disorder, with borderline and antisocial features." The defendant also offered the testimony of John A. Cegalis, a psychologist, and Harry L. Kozol, a neuropsychiatrist. Both corroborated the opinion set forth by Owen in his report that the defendant was depressed and presented paranoid schizophrenic process. The defendant then offered the full text of Owen's report as an exhibit. The state objected to the admission of the report on hearsay grounds, and cited the rule that while a medical expert may testify as to the contents of a report on which he or she has relied in forming an opinion, the decision as to whether to admit the report itself as evidence lies within "the judicious exercise of discretion by the trial court." See *Cross* v. *Huttenlocher,* 185 Conn. 390, 395–97, 440 A.2d 952 (1981). The court sustained the state's objection.

The state's expert witness, Donnelly, rebutted the testimony of Cegalis and Kozol regarding their assessments of Owen's report. Donnelly testified that it was his professional opinion that the defendant was not under the influence of extreme emotional disturbance on the evening of the crimes, and did not lack the ability, due to a mental disease or defect, to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law. Donnelly acknowledged that he had ordered certain psychological tests to be performed on the defendant by Owen but that, subsequently, he did not fully incorporate or rely on the results of those tests in his own evaluative report.

Arguing that the state's expert had now called into question the reliability and usefulness of Owen's psy-

chological testing, the defendant sought to rebut the implications of Donnelly's testimony by presenting Owen's own statements regarding his report.[10] The court denied the defendant's request, for the following three reasons. First, because Owen had recently suffered a stroke and would not physically be able to testify in court, the defendant's request was in reality to recess the trial to permit him to take Owen's deposition, which would then be offered as evidence. The court refused to impose any additional delay in the proceedings because of the extreme length of the trial at that point and because the defendant had already been granted one recess for the purpose of deposing an unavailable witness.[11] Second, the defendant admitted having received Owen's report over six months previously while Owen had been stricken three months previously. The court deemed that to have been adequate time for the defendant to deal with matter of how to present evidence of the contents of the report. Third, the court noted that the defendant had already presented one psychologist, Cegalis, who had testified favorably to the defendant regarding Owen's testing and conclusions. The court concluded that the proposed evidence from Owen regarding his findings would be cumulative to the expert testimony already presented and did not warrant further delay in an already exceedingly lengthy trial and therefore denied the defendant's request.

---

[10] In his request to the court for permission to present additional evidence, defense counsel stated: "The way in which Dr. Donnelly dealt with Dr. Owen's findings, and attempted to explain why he didn't adopt or even refer to them in his report, makes it necessary, I believe, to rebut the testimony and the implication from the testimony, that Dr. Owen's report was unreliable, that psychological reports generally, at least in some circumstances, are unreliable, and to attempt to show that Dr. Owen's report, which came to a different conclusion than Dr. Donnelly came to, was conducted under reliable circumstances, by a reliable psychologist."

[11] The court had recessed the trial to permit the defendant to take the deposition of Attorney Charles Wood, a patient at Gaylord Hospital.

The trial court is vested with considerable discretion in the matter of rebuttal evidence. *State* v. *Simino,* 200 Conn. 113, 123, 509 A.2d 1039 (1986); *State* v. *Lisella,* 187 Conn. 335, 337, 445 A.2d 922 (1982). "Ideally, rebuttal evidence is that which refutes the evidence [already] presented . . . rather than that which merely bolsters" one's case. *State* v. *Lisella,* supra. The defendant had previously presented, through the testimony of Kozol and Cegalis, the essential features of Owen's testing results. The court could reasonably have found the proposed deposition testimony from Owen to be cumulative in nature, and designed primarily to bolster the defendant's case rather than to refute further the testimony of Donnelly, the state's expert witness. See *State* v. *Watley,* 195 Conn. 485, 490, 488 A.2d 1245 (1985); *State* v. *Lisella,* supra. Because the proposed testimony was merely cumulative and would delay the already lengthy trial, and in further view of the fact that the defendant had had the opportunity to depose this witness whose report had been known to him for more than six months, we hold that the court's refusal to grant the defendant's request to take the deposition of Owen was a reasonable exercise of its sound discretion. *State* v. *Simino,* supra; *State* v. *Lisella,* supra.

B

The defendant next requested that the court deliver to the jury an adverse inference instruction regarding Owen. The defendant sought an instruction that, since the state had not called Owen to testify, the jury could infer that the reason he had not been called was because his testimony would have been unfavorable to the state on the issues of the defendant's criminal responsibility and extreme emotional disturbance. The defendant contends that because Owen had been retained by the state for purposes of examining the defendant and was available to be deposed (because, on advice of his phy-

sician, he was not available to testify in court), Owen was a witness whom the state would naturally be expected to produce. The defendant argues, therefore, that the state's failure to call Owen entitled the defendant to a *Secondino* instruction.

"The failure to produce a witness for trial who is available and whom a party would naturally be expected to call warrants an adverse inference instruction against the party who would be expected to call that witness. *Secondino* v. *New Haven Gas Co.,* 147 Conn. 672, 674–75, 165 A.2d 598 (1960)." *State* v. *Santangelo,* 205 Conn. 578, 596, 534 A.2d 1175 (1987); see also *State* v. *Amarillo,* 198 Conn. 285, 307, 503 A.2d 146 (1986). An inquiry into the appropriateness of a *Secondino* instruction is, accordingly, two-pronged: whether the witness is "available" and whether, under the facts of this case, the witness is one whom the state would naturally be expected to produce.

We agree with the trial court that the defendant failed to establish his entitlement to a *Secondino* instruction. First, the defendant did not demonstrate that Owen was available. "His availability as a witness was a fact to be shown by the [defendant] as the [party] to be benefited by the inference. . . . " (Citations omitted.) *Fontaine* v. *Coyle,* 174 Conn. 204, 209, 384 A.2d 616 (1978). Further, "[b]efore a negative inference can be drawn from a party's failure to produce a witness, it must be shown that the party was able to procure the witness' *physical presence in court.*" (Emphasis added.) *Shelnitz* v. *Greenberg,* 200 Conn. 58, 74–75, 509 A.2d 1023 (1986). The defendant's counsel asserted that he had spoken to Owen's physician, who had indicated that Owen's health would permit a deposition but not an in-court appearance. Such a representation does not constitute an evidentiary showing of availability. See *State* v. *Santangelo,* supra, 585. The defendant has, therefore, failed to meet his burden as to this prong.

This being the case, it is unnecessary to consider whether Owen was in fact a witness whom the state would naturally have been expected to produce. Further, "[a] possible witness whose testimony is for any reason comparatively unimportant, cumulative or inferior to what has been offered should be dispensed with on the general ground of expense and inconvenience, without anticipation that an inference may be invoked." *State* v. *Brown,* 169 Conn. 692, 705, 364 A.2d 186 (1975); *Fontaine* v. *Coyle,* supra, 209–10.

## IV

The defendant next claims that the court delivered an erroneous instruction on the consequences of a finding of guilty but not criminally responsible. The trial court is required by General Statutes § 54-89a to inform the jury of the consequences for the defendant of this verdict, including the confinement and release provisions of General Statutes (Rev. to 1983) § 53a-47 (now General Statutes §§ 17-257a through 17-257w).[12] The trial court did so.

This statutory requirement is contrary to the common law rule that a jury is not to be instructed on the consequences of a verdict. The common law rule is premised on the principle that a jury's verdict should be based solely on the evidence before it, rather than on any notions of sympathy or fear. *State* v. *Holmquist,* 173 Conn. 140, 143–44, 376 A.2d 1111, cert. denied, 434 U.S. 906, 98 S. Ct. 306, 54 L. Ed. 2d 193 (1977).

---

[12] "[General Statutes] Sec. 54-89a.  COURT TO INFORM JURY ON CONSEQUENCES OF A FINDING OF NOT GUILTY BY REASON OF MENTAL DISEASE OR DEFECT. If the court instructs the jury on a defense of mental disease or defect raised pursuant to section 53a-13, it shall, unless the defendant affirmatively objects, inform the jury of the consequences for the defendant if he is found not guilty by reason of mental disease or defect and of the confinement and release provisons of sections 17-257a to 17-257w, inclusive, applicable to a person found not guilty by reason of mental disease or defect."

Section 54-89a departs from that principle in cases involving the insanity defense, where, in addition to the usual verdicts of "guilty" or "not guilty," there exists the additional possibility of a verdict of guilty but not criminally responsible by reason of mental disease or defect.[13]

The defendant first complains that the court erred in indicating to the jury that it was delivering this instruction because the law required it to do so. The defendant claims that the court thus implied that its own private view was to the contrary but it nevertheless delivered the instruction not because the court agreed with the instruction, but because it was under a legal mandate to do so. The defendant cites no authority to support either the inference he chooses to draw from this language or the proposition that this was error. Furthermore, the fact that the jury *did* return a verdict of guilty but not criminally responsible warrants the inference that the instruction had its desired effect, not that the court's statements discredited the required charge.

---

[13] In actuality, General Statutes 54-89a furthers the principle that a jury's verdict should be based on the evidence and not on sympathy or fear, as the trial court correctly observed: "Jurors are aware generally of the meanings of verdicts of guilty or not guilty. It is common knowledge that a verdict of not guilty means that the accused goes free, and a verdict of guilty means that he is subject to such punishment as the Court may impose. But a verdict of guilty but not criminally responsible, is somewhat ambiguous, and has no such commonly understood meaning, because a finding of guilty implies conventional punishment, while a finding of lack of criminal responsibility suggests some other type of disposition. Accordingly, the Court has been directed by the legislature to make it clear to the jury that such a verdict means neither freedom nor punishment. It means the accused will be confined in a hospital for the mentally ill, until the superintendent of such hospital certifies and the Court is satisfied that such person has recovered his sanity and will not in the reasonable future be dangerous to himself or others." The effect of the required instruction is to promote verdicts grounded on the evidence, rather than on the fear of an uninformed jury that a dangerous, disturbed person might be set free upon the rendering of a verdict of guilty but not criminally responsible.

The defendant's second claim with regard to the § 54-89a instruction relates to the court's comments concerning its view of the purpose behind the statutory provision. The court stated: "Our legislature has concluded, I believe, that the jury has a right to know the *meaning* of this possible verdict as accurately as it knows by common knowledge the commonly understood *meaning* of the more familiar verdicts and unambiguous verdicts of guilty and not guilty." (Emphasis added.) The defendant contends that this was erroneous, in that the statutory purpose, as revealed by the sparse legislative history on this point, was to "instruct the jury as to what the *penalty* would be if the defendant were indeed found guilty but not criminally responsible."[14] (Emphasis added.) The defendant perceives in this language a distinction of fundamental proportions that rendered the instruction fatally flawed. We disagree.

Viewed in context, the defendant's argument "elevates form over substance." *State* v. *Gonzalez,* 206 Conn. 213, 219, 537 A.2d 460 (1988); *State* v. *Weidenhof,* 205 Conn. 262, 269, 533 A.2d 545 (1987). Although the court employed a word (meaning) different from that used in the statute (consequences) or legislative history (penalty), we conclude that this use was not misleading. The effect of the court's statements was to inform the jury of the potential dispositions following various verdicts. The fact that the information was couched in terms of the "meaning" of a verdict rather than the "consequences" of a verdict is of no moment. We conclude that, although there was no "utterance of talismanic words"; *State* v. *Weidenhof,* supra; it is

---

[14] Remarks of Representative Alfred J. Onorato: "[The statute] requires the court if there is no objection from the defense counsel, to instruct the jury as to what the penalty would be if the defendant were indeed found guilty but not criminally responsible." 24 H.R. Proc., Pt. 18, 1981 Sess., p. 5962.

not reasonably likely that the jury was misled by this minor variation in language. See *State* v. *Foster,* 202 Conn. 520, 541, 522 A.2d 277 (1987).

The defendant's final claim with respect to the court's § 54-89a instruction is that the court erred in directing the jury not to base their verdict on this knowledge of the consequences of a finding of guilty but not criminally responsible. After reading to the jury the relevant confinement and release provisions of § 53a-47, as mandated by § 54-89a, the court instructed the jury "to make your determination solely on the basis of the evidence before you, and not upon your knowledge or lack of knowledge of the possible consequences that may follow such verdict." The defendant characterizes this portion of the charge as "judicial evisceration" of the § 54-89a statute.

At common law, the matter of punishment was not an issue for the jury but for the court, and therefore not an appropriate subject for the jury's consideration or for the court's instruction to the jury. *State* v. *Holmquist,* supra. Section 54-89a, enacted in derogation of this common law principle, is to be construed narrowly in order to leave undisturbed those aspects of the common law not directly affected by the statute. *State* v. *Kish,* 186 Conn. 757, 764–65, 443 A.2d 1274 (1982). Section 54-89a requires only that the court *inform* the jury of the consequences that may follow a verdict rendered after a successful insanity defense. It does not nullify the general rule that a jury base their verdict solely on the evidence before it. A narrow construction of § 54-89a comports with this general rule by ensuring that the jury possesses information that enables it to reach a determination based on the evidence, yet remains unaffected by sympathy, fear or other inappropriate and irrelevant concerns. The court noted that the § 54-89a information "was given to you in order to resolve what appears to be the ambiguous form of

. . . [a guilty but not criminally responsible] verdict which, although it negates criminality, makes reference to guilt." Having resolved a potentially troubling ambiguity, the court thus enabled the jury to turn its unfettered and complete attention to the only proper basis for a verdict, the evidence before it. We conclude that the defendant's claims with respect to this issue are without merit.

V

The two homicides committed at the White Pine Lane residence gave rise to charges of murder in violation of § 53a-54a for the deaths of Patricia Voli and Elisa Wood. These murders also formed the basis for the state's charge of capital felony for multiple murders committed in the course of a single transaction in violation of § 53a-54b (8). See footnote 2, supra. The jury returned guilty verdicts as to all three charges, and the court accepted the verdicts and rendered judgment thereon.

The defendant claims, and the state concedes, that the court erred in rendering judgment on the two murder convictions. It is a violation of the double jeopardy clause of the fifth amendment to impose punishment for both the capital felony and the murders that constitute the lesser included offense. *State* v. *Usry,* 205 Conn. 298, 318, 533 A.2d 212 (1987); *State* v. *McGann,* 199 Conn. 163, 178, 506 A.2d 109 (1986); see *State* v. *Goldson,* 178 Conn. 422, 424–25, 423 A.2d 114 (1979).

There is error in part and the case is remanded to the trial court with direction to vacate the judgment of conviction with regard to the two counts of murder for the deaths of Patricia Voli and Elisa Wood.

In this opinion the other justices concurred.